General Spring Corporation v. Commissioner. Francis L. Field v. Commissioner.
General Spring Corp. v. Commissioner
Docket Nos. 31644, 31645.
United States Tax Court
1953 Tax Ct. Memo LEXIS 169; 12 T.C.M. (CCH) 847; T.C.M. (RIA) 53257; July 27, 1953
Benjamin P. DeWitt, Esq., Harry E. Howell, Esq., and Sidney Pepper, Esq., for the petitioners. John J. Madden, Esq. and Francis J. Butler, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings involve respondent's determination of a deficiency in income and personal holding company taxes for the year 1943 against petitioner General Spring Corporation, hereinafter referred to as "General Spring," in the amount of $47,274.39, a claimed overpayment by General Spring in the amount of $3,603.48 respondent's determination of a deficiency in income tax for the year 1943 against *170 petitioner Francis L. Field, [1] hereinafter called "Field," in the amount of $429.12, and a claimed overpayment by Field in the amount of $53,849.53. Several of the assignments of error appearing in the petition have been agreed upon or conceded by the parties. The remaining issues are: 1. Whether the agreement dated October 16, 1933 between General Spring and Grinnell Company, Inc., hereinafter called "Grinnell," respecting certain patent rights constituted a sale of a capital asset under the provisions of section 117 of the Internal Revenue Code so that the proceeds are taxable only as capital gains. 2. If the transaction constituted a sale, whether General Spring, in determining the net capital gains from such sale, should be permitted to adjust the basis of the patents by adding thereto the amounts paid as salary to Field and Joseph Kaye Wood, hereinafter called "Wood," or deduct such sums from the gross payments received from Grinnell Company, Inc., as costs incurred in obtaining the proceeds of the sale. 3. Whether the salary of $147,000 *171 paid by General Spring to Field and Wood in 1943 was reasonable compensation for services performed during 1943 or for services performed from May 6, 1935 to and including 1943, or whether the amount deductible by General Spring should be limited to $38,000 as determined by respondent. 4. If any portion of the amount paid by General Spring to Field is not deductible, whether that amount is free from taxation to Field to the extent that the payment thereof impaired the capital of General Spring. 5. Whether the amount of compensation received by Field in 1943 is taxable under the provisions of section 107 of the Internal Revenue Code. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner General Spring, a corporation organized under the laws of the State of New York on April 18, 1928, has its principal office at 500 Fifth Avenue, New York, New York. Fifty-one per cent of General Spring's stock is owned by petitioner Field and forty-nine per cent is owned by Joseph Kaye Wood. The income and personal holding company tax returns for the year in question were filed with the collector of internal revenue for *172 the third district of New York. On April 12, 1928, Field and Wood agreed that all inventions or patent rights created or acquired by either relating to springs would become the property of General Spring. U.S. patent 1,309,270, assigned by Wood to General Spring on April 23, 1928, covered a device for measuring the inside of rock tunnels, for which there was need of only one device in the United States. On August 29, 1930, Wood filed an application for a patent covering a spring constant-support pipe hanger, for which U.S. patent 1,816,164 was issued on July 28, 1931 to General Spring as the assignee of Wood. On September 6, 1931, Wood developed an improvement which he assigned to General Spring and on which he submitted patent application 654,638 on February 1, 1933. U.S. patent 1,937,135 was issued for the improved support on November 28, 1933. Steel pipe through which steam flows at approximately 1,000 degrees fahrenheit is subject to expansion which in turn causes movement and a transfer of weight in the piping. The hangers covered by U.S. patents 1,816,164 and 1,937,135 provide constant support for such piping in order to relieve it from the strains caused by such weight *173 shifting. Prior to October 16, 1933, General Spring had constant-support hangers manufactured for it by the Treadwell Company and the Bergen Iron Works. It employed salesmen and issued several catalogues in order to market these hangers. On October 16, 1933, General Spring entered into an agreement with Grinnell, which stated in part: "WHEREAS, General Spring is the owner of United States Letters Patent No. 1,816,164, dated July 28, 1931, and application for United States Letters Patent, in the name of Joseph Kaye Wood, dated February 1, 1933, Serial No. 654,638, relating to supports, hereinafter called 'said patents'; * * *
"1. General Spring hereby grants to Grinnell the exclusive right and license to manufacture, sell, use, and install within the United States, its territories and possessions, and in Canada, supports used in the piping industry covered by the said patents, or by any further inventions or improvements thereof, patent rights to which may be owned or acquired by General Spring. "2. It is understood and agreed that Grinnell shall vigorously push in the regular course of business the manufacture and sale of devices covered by this agreement, and General *174 Spring agrees to turn over and give to Grinnell all information, sales prospects and inquiries, relating to the said devices which it has or receives pertaining to the same. "3. Grinnell shall pay to General Spring as a license fee for the supports made and sold under the license granted herein an amount equal to one-half the difference between sales price and total manufacturing and selling costs. In order to simplify the calculation of amounts due under this agreement, a schedule of royalties shall be agreed upon during each six months calendar period, to be used in calculating the royalty due for that period; in the absence of said schedule, the royalty shall be calculated and paid on the basis of actual costs and sales prices. * * * * * *
"5. It is mutually covenanted and agreed that this agreement shall not be assigned without the written consent of the other party first having been obtained. * * *
"7. It is mutually convenanted and agreed that the exclusive right herein granted shall, unless terminated in accordance with the terms of Paragraph 8 hereof, run and continue to the end of the term and any extensions thereof for which said Letters Patent have been or *175 shall be granted, inclusive of Letters Patent that may hereafter issue to or be acquired by General Spring upon inventions or improvements within the scope of Paragraph 1 hereof. "8. It is mutually covenanted and agreed that General Spring shall have the right to cancel the license provided for in this agreement if the royalties paid by Grinnell under this agreement do not equal or exceed the sum of Five Thousand ($5,000) Dollars in any calendar year in which this agreement is in force and effect, or if Grin ell shall engage either directly or indirectly in the promotion or sale of any other competing devices, not within the scope of this agreement, for substantially the same use as the devices covered by this agreement; * * * provided, further, that no rights shall exist prior to December 31, 1934, to cancel the license granted under this agreement because of failure of royalties accrued during the previous twelve months' period to equal or exceed the said sum of Five Thousand ($5,000) Dollars. General Spring may at its option exercise such right of cancellation by serving upon Grinnell before the eleventh day of January of the year immediately following that in which the act, omission *176 or condition constituting the ground of cancellation may occur, a notice of cancellation specifying the act, omission, or condition relied upon. Within ten days after receipt of said notice of cancellation, Grinnell shall have the option, on the one hand, of paying the balance of said Five Thousand ($5,000) Dollars, or of permanently discontinuing the sale of said other devices for the same purpose, or on the other hand, of accepting cancellation of the license provided for under this agreement. * * * "9. Notwithstanding the provisions of paragraph 5 hereof, this agreement with all its benefits and duties and liabilities may be transferred, together with the entire business to which it appertains, to successors of the parties, or either of them, provided that the parties hereto, even after such transfer, shall remain liable for the full and faithful performance by such transferee-successor of all terms, agreements and conditions of this agreement. "10. General Spring reserves the right to sue infringers, but if Grinnell shall be of the opinion that any patent or patents embraced within this agreement is infringed by others, it may call this situation to the attention of General *177 Spring, making full disclosure of all relevant facts known to Grinnell, and request General Spring to cause suit to be brought against the alleged infringer or infringers, and if such suit shall not be brought promptly after such disclosure and request, Grinnell may bring suit at its own expense, joining or using the name of General Spring as party plaintiff. * * *
"12. Grinnell agrees that any and all improvements or developments which it may make on the supports covered by the aforesaid patents shall be duly assigned to General Spring with the understanding, however, that Grinnell shall reserve to itself the right to manufacture, use and sell the said developments and improvements during all times. "13. In the event of cancellation of this license in accordance with the provisions of paragraph 8 hereof, General Spring shall purchase from Grinnell, at cost, its stock on hand of current models of devices covered by General Spring patents within the scope of this license, of parts therefor and of special dies, jigs and tools therefor, provided that General Spring shall not be obligated to purchase such material to a value greater than Twenty-Seven Hundred ($2,700) Dollars. *178 " By this agreement General Spring sold U.S. patents 1,816,164 and 1,937,165 to Grinnell. These inventions were held by General Spring for more than six months prior to the agreement. All other patents thereafter issued to General Spring relate to the one invention covered by U.S. patent 1,816,164. General Spring's Certificate of Incorporation listed two of its purposes as being: "To patent, manufacture and develop, all types, kinds and sizes of mechanical springs and any and all devices and products in which springs are an essential part; and to sell the royalty rights connected therewith. "To apply for, obtain, register, purchase, lease or otherwise acquire, and to hold, own, operate, introduce and sell, assign, or otherwise dispose of any and all trademarks, formulae, secret processes, tradenames, brands, distinctive marks, copyrights, and all inventions, improvements and processes used in connection with or secured under letters patent or otherwise of the United States or of any other country; and use, exercise, develop, grant licenses in respect of or otherwise turn to account any and all such trademarks, patents, licenses, copyrights and the like, or any such property *179 rights and information so acquired." General Spring's corporate income and declared value excess profits tax return for 1943 listed the kind of its business as "Inventing and developing Spring products, etc. Licensing under Royalty Contracts." On a schedule entitled "Depreciation on Patents," General Spring listed patents 1,816,164 and 1,937,135 and took depreciation of $161.06 and $167.05, respectively, on such patents. In its 1943 Return of Capital Stock Tax, General Spring listed the nature of its business as "Licensing and Developing Spring Devices, etc." In its 1943 Return of Personal Holding Company, it reported royalties received as follows: Royalties Received
$201,066.87
Grinnell Co., Providence, R.I.
$200,463.87
Babcock & Wilcox, Ltd. London, Eng.
603.00
Total
$201,066.87
Engineering Fees & Expenses
105.39
$201,172.26
Prior to October 16, 1933, General Spring did not sell nor offer to sell any patents. General Spring was not engaged in the business of selling patents. The patents referred to in the agreement with Grinnell were not properly includible in the inventory of General Spring, were not held by General Spring as stock in *180 trade, and were not held by General Spring primarily for sale to customers in the ordinary course of its business. Petitioner General Spring made similar agreements with Babcock and Wilcox, Ltd., and Deutsche Rohrleitungsbau A. G. respecting its patent rights in other parts of the world. General Spring received the following payments from Grinnell and Babcock and Wilcox, Ltd.: Amount
Year
Grinnell
Babcock & Wilcox
1933
None
None
1934
None
None
1935
$ 1,000.00
None
1936
2,000.00
None
1937
10,705.02
$8,395.84
1938
11,401.55
1,127.25
1939
9,707.88
1,401.78
1940
18,577.25
1,191.00
1941
55,389.05
1,206.00
1942
75,466.51
1,206.00
1943
200,463.87
1,206.00
The number of constant-support hangers covered by the October 16, 1933 agreement with Grinnell and sold by Grinnell during the years 1935 to 1943, inclusive, was as follows: Type
Year
H-11
H-12
H-14
1935
0
0
0
1936
72
0
0
1937
960
0
0
1938
611
0
0
1939
397
0
204
1940
955
0
30
1941
732
0
762
1942
927
102
2,778
1943
1,377
298
7,325 A very few of the H-11, about half of the H-12, and all of the H-14 were sold to *181 the Navy. At all times since April 23, 1928, Field has been president, treasurer and a director of General Spring, and Wood has been vice president, chief engineer and also a director. Field was admitted to the bar of the State of New York in 1903. Prior thereto he was a midshipman in the Coast Guard and Navy. Wood is a mechanical engineer, a graduate of the United States Naval Schools of Steam Engineering and Turbine Engineering, a former engineer officer in the Navy during World War I, a member of the American Society of Naval Engineers, the Society of Naval Architects, the American Society of Mechanical Engineers, the Engineers' Club and the Army and Navy Club, the founder and former chairman of the Committee on Mechanical Springs of the American Society of Mechanical Engineers, and an author of more than fifty scientific papers and articles in the field of engineering. From October 16, 1933 through 1943, Field and Wood endeavored to gain acceptance of the constant-support hangers among engineers and potential users of the product by developing an awareness of the problems which the constant-support hanger was designed to overcome, by designing variations to meet the particular *182 needs of a user, and by aiding Grinnell salesmen with engineering and technical skill. Field sometimes made the initial contact with executives of a prospective user of the constant-support hanger and sometimes accompanied Wood to the prospect's plant or headquarters where Wood would discuss the engineering of the constant-support hanger. In 1936 and in 1939, Wood took a 20,000 mile trip around the country to visit the branch offices of Grinnell, to lecture the officials and sales engineers on the constant-support hanger, and to accompany them on calls on prospective users. Grinnell paid the expenses of these trips and an additional amount for Wood's unusual expenses. Wood developed and published the engineering procedure relating to the constant-support hanger. He also assisted Grinnell by giving advice on engineering production problems, by answering questions of customers, by designing special custom-made hangers, by designing improvements to lower Grinnell's production costs, by supervising the drafting of more than 1,000 drawings, and by doing weight balance calculations. In the early 1930's, Mason S. Noyes, an engineer in the Bureau of Engineering of the Navy Department, *183 spoke to Wood about the hanger and discussed with Grinnell salesmen the possibility of purchasing the hanger. In 1933 the Navy drew plans for a group of destroyers in which it planned to use the hanger. Around 1935, the hanger was put on a proprietary status by the Navy. This meant that it was a good article, that there was only one source of supply, and that shipyards could, if they wished, buy it for naval use without competitive bids. Down through 1943, there were continuing problems in connection with its installation in different types of ships. On March 28, 1934, Grinnell wrote petitioner General Spring a letter which stated in part: "This will also confirm our verbal advice to the effect that it is agreeable with us for you to manufacture and sell the so-called Navy Type Spring Hanger for Marine work only. This may be considered as coming outside of the scope of our contract with you. At a later date should it appear that it would be to our mutual advantage for us to take on the manufacture and sale of this additional line we would be very glad to consider the matter." On January 2, 1941, General Spring entered into the following agreement with Grinnell: "1. Your Company *184 [General Spring] will forthwith cease all further selling activities in any field of any type of so-called Grinnell-Genspring Constant Support Hangers manufactured by us under our License Agreement dated October 16, 1933, and will relinquish all claims to any manufacturing or selling rights with respect to such Hangers. "2. Mr. Wood will introduce our [Grinnell's] representatives to the naval, marine, ship building and marine architect officials with whom he has been in contact and will render preliminary assistance in getting their work in this field underway. "3. We will assign a man from our organization satisfactory at all times to your Company exclusively to vigorously promoting Genspring Hanger sales for all uses, who will be located at our Providence headquarters and will be available to render all necessary sales assistance to our men in the field and to actively follow-up all sales. * * * "4. You will make available to us when possible Mr. Wood's engineering services to such extent as we may from time to time require at a per diem rate of twenty-five dollars ($25.00) and necessary travelling expense. To avoid difficulties each such request shall require authorization *185 from our Providence Office. "On the above basis we are willing with respect to all orders for H-14 Hangers for naval and marine use received by us during the calendar year 1941 to pay you in lieu of the royalties fixed for H-14 Hangers on June 30, 1939 a basic royalty of $20.50 per Hanger and an additional royalty (in recognition of your past sales efforts) of $7.50 per Hanger. We will further advance to you as such orders are received said additional royalty of $7.50 per Hanger." In 1943, Field accompanied Wood on trips in connection with the problems relating to the hydraulic shock absorber unit, stimulated activity on the part of Grinnell, had contacts with Naval officers with respect to the hanger, furnished Grinnell with the names of prospective purchasers for the hangers, settled any legal questions that came up as best he could, and supervised the activities of General Spring. From May 6, 1935 through the year 1942, Field and Wood performed services similar to those they performed in 1943. The sale of constant-support hangers by Grinnell increased from $9,144 in 1936 to $1,045,155 in 1943. This increase was due in part to increased Navy orders. The services of Field *186 and Wood after the 1933 sale of General Spring's patents to Grinnell were performed in order to increase the purchase price payable to General Spring. Field and Wood received no compensation from General Spring from April 23, 1928 until December 1, 1937. On the latter date, the Board of Directors passed the following resolution: "RESOLVED: that a minimum salary of $10,000 a year be paid to the President, Francis L. Field, and also to the Vice-President, Joseph Kaye Wood, for each year's services from the formation of the Corporation in 1928 to and including the year 1937, in recognition of their services to which the present favorable condition of the Corporation for increased earnings can be attributed. * * *
"RESOLVED: that these salaries shall be paid whenever, in the opinion of the Board of Directors, the working capital and financial condition of the Corporation may warrant, and that in any event the amount to be paid for prior years' services shall be determined by the Board and the year for which such salaries are paid shall be stipulated and approved at a meeting of the Board. * * *
"RESOLVED: that nothing in this Resolution shall be so construed as to obligate *187 the Corporation to pay salaries until the amount of the salary for the year in question and the time for payment have been definitely fixed and approved by the Board of Directors." Pursuant to this resolution, the Board voted that Field and Wood be paid a salary of $5,200 each on or before December 31, 1937 to apply against their 1928 services. Thereafter, General Spring paid Field and Wood, respectively, $5,200 in 1938, $2,600 in 1939, $8,000 in 1940, $22,000 in 1941, and $30,500 in 1942. On July 31, 1943, the Board of Directors passed the following resolution: "RESOLVED: that, in continuing the practice of paying off the earned, but unpaid salaries of Francis L. Field, President, and J. Kaye Wood, Vice-President, for the years of 1928 and thereafter, in the amount of $10,000.00 per year each, to and including the year 1937, after which year the salaries were fixed at $15,000.00 each for the year 1938 and $25,000.00 for the year 1939 and $30,000.00 for the years 1940, 1941 and 1942, making a total due each, as of January 1, 1943, of $230,000.00, against which has been paid a total of $73,500.00 each, covering the salaries for 1928 to 1934 both inclusive, and $3,500 each on account *188 of their salaries for 1935, and, "RESOLVED: that the foregoing practice be continued until all back salaries of the aforesaid officers have been paid in full, and "RESOLVED: that the salaries of Francis L. Field and J. Kaye Wood, as officers of this Corporation be fixed at $30,000.00 each for the year 1943, to be paid after the back salaries are fully paid, and" * * *
In 1943, General Spring paid Field and Wood, respectively, $73,500. If all of the amounts paid were applied in accordance with the above resolutions of the Board of Directors, the following schedule would show the years for which payments were made: Year for which payments were
applied according to the resolu-
Amount paid each
tions of the Board of Directors
Year of
stockholder in
and the amount of such annual
Payment
year of payment
application
Year
Amount
1937
$ 5,200.00
1928
$ 5,200.00
1938
5,200.00
1928
4,800.00
1929
400.00
1939
2,600.00
1929
2,600.00
1940
8,000.00
1929
7,000.00
1930
1,000.00
1941
22,000.00
1930
9,000.00
1931
10,000.00
1932
3,000.00
1942
30,500.00
1932
7,000.00
1933
10,000.00
1934
10,000.00
1935
3,500.00
1943
73,500.00
1935
6,500.00
1936
10,000.00
1937
10,000.00
1938
15,000.00
1939
25,000.00
1940
7,000.00
*189 There was no agreement or other obligation for the payment of compensation to Field or Wood which was enforceable prior to the years of payment. General Spring had no sales force in 1943, but its 1943 return reported salaries paid to persons other than its officers. At all times since April 23, 1928, General Spring has maintained its books and filed its income tax returns on a cash receipts and disbursements basis. Its income tax returns for the calendar years 1937 through 1943 show the following: Total of Amounts of
Compensation paid to
Gross
Francis L. Field and
Other
Net
Year
Income
Joseph K. Wood
Expenses
Income
1937
$ 19,195.86
$ 10,400.00
$ 6,244.13
$ 2,551.73
1938
12,628.80
10,400.00
2,913.04
-684.24
1939
10,724.15
5,200.00
3,461.96
2,062.19
1940
19,768.25
16,000.00
2,809.14
959.11
1941
55,864.05
44,000.00
9,497.50
2,366.46
1942
77,957.51
56,000.00
16,687.09
5,270.42
1943
201,775.26
147,000.00
39,882.35
14,892.91
General Spring's tax returns for 1943 disclosed a tax liability of $3,603.48. A dividend paid of $10,000 was also reported. The compensation paid by General Spring to Field and *190 Wood in 1943 was reasonable for the services performed by them for General Spring for the period from May 6, 1935 through 1943, inclusive. The amount received by petitioner Field in 1943 did not constitute back-pay within the provisions of section 107 of the Internal Revenue Code. Opinion That the transaction by which petitioner transferred its patent rights in the constantsupport hanger was a sale, we think follows from the weight of authority now available in this field. Kimble Glass Co., 9 T.C. 183; Kronner v. United States, (Ct. Cl.) 110 Fed. Supp. 730; Edward C. Myers, 6 T.C. 258; Kavanaugh v. Evans ( C.A. 6) 188 Fed. (2d) 234Lamar v. Granger, ( D.C., W.D. Pa.) 99 Fed. Supp. 17. It is true that the proceeds were not received in a single payment, that there was some qualification on the assignee's right to sue for infringements, and that its authority to reassign was restricted. These aspects, however, have been held not to be evidence of a retention of title by the assignor. Kimble Glass Co., supra; *191 Commissioner v. Hopkinson, (C.A. 2) 126 Fed. (2d) 406; Allen v. Werner ( C.A. 5) 190 Fed. (2d) 840; Parke, Davis & Co., 31 B.T.A. 427, Acq. XIV-1 C.B. 15. And that payments were denominated royalties and the arrangement called a license is likewise inconclusive. See Lynne Gregg, 18 T.C. 291, affd. (C.A. 3) 203 Fed. (2d) 954. Even the facts that petitioner deducted depreciation on the patents after the transfer, that its tax returns showed its business to be "Licensing under Royalty Contracts," and that it claims to have expended large sums in the further development of the patent seem to us ineffective to alter the basic provisions of the contract of transfer, especially as it was subsequently construed and given effect by the parties. We conclude that what petitioner accomplished by that agreement was a sale of its patent rights. The benefits of section 117 (j) would, even so, not necessarily be available to petitioner without the further element that what it sold was a capital asset. Enough has already been said to indicate *192 that this question is likewise not free from doubt. Holding a patent for exploitation by means of licenses may preclude its classification as a capital asset as much as a holding for sale. See Harold T. Avery, 47 B.T.A. 538; L. Hand, J. concurring in Goldsmith v. Commissioner, (C.A. 2) 143 Fed. (2d) 466, 468, certiorari denied 323 U.S. 774. But the invention in question was the only one of value developed by petitioner up to the time of sale, or in fact at any time shown by the record. Efforts had been made to exploit it by means of manufacture and distribution on petitioner's own account. We think enough has been shown to satisfy us that when General Spring entered into its contract with Grinnell it disposed of its only incomeproducing asset. The result is that petitioner's claim to capital gains treatment is sustained. Nor do we think petitioner is incorrect in contending that sums expended by it for services performed by its officers resulting in increased collections as the purchase price of the articles sold are properly chargeable to capital account. See Lanova Corporation, 17 T.C. 1178, 1185. The record appears to us *193 to demonstrate conclusively that the services of the officers performed subsequent to the sale were to a large extent responsible for the increased business flowing to Grinnell and thereby indirectly for large additional payments made by Grinnell to General Spring under the agreement. Services performed in such special fields as those of brokers, lawyers and the like may be appropriately dealt with as capital items. See Irma Jones Hunt, 47 B.T.A. 829; Therese C. Johnson, 7 T.C. 465, 474, affd. in part and reversed on other issue (C.A. 5) 162 Fed. (2d) 844. And the fact that these services were performed by petitioner's own employees does not necessarily require a different conclusion. See Acer Realty Co., (C.A. 8) 132 Fed. (2d) 512, 514. Unlike that case, however, these services contributed not to the increased value of the capital asset retained by petitioner, but to the collection of additional sums representing the selling price of an article already disposed of. "In his published rulings the respondent recognizes expenses incident *194 to the sale in cases of this sort as an 'offset' to the sale price and not as a part of the cost of the land. See I.T. 2305, C.B. V-2, p. 108; I.T. 2340, C.B. VI-1, p. 43." Mrs. E. A. Giffin, 19 B.T.A. 1243, 1246. For this reason we conclude that the amounts in controversy are deductible as capital items but by way of a reduction of the receipts obtained from the sale, rather than as additions to basis. It may be that no amounts could be deducted that were unreasonable in view of the statutory language referring to items "properly" chargeable to capital account. See I.R.C., section 113 (b) (1) (A). This is a question we need not now decide. As our findings show, we have determined that, considering the services rendered from 1935 through the year in controversy, 1943, the total payments made to petitioner's two officers were not unreasonable. The services rendered, their successful termination, and the increased benefits accruing to petitioner therefrom are all elements contributory to such a finding. That payments of compensation can, when circumstances *195 warrant, cover services rendered in the past as well as those for the current year is by now well settled. Lucas v. Ox Fibre Brush Co., 281 U.S. 115. Assuming that the $73,500 paid to each officer in 1943, the year in controversy, were to be allocated equally over the more than eight years from some time in 1935 through 1943, it would amount to not much more than $9,000 a year. We cannot say that these sums would be unreasonable. Whether further payments possibly made in subsequent years and purporting to cover the same period might be justified, is not of course an issue in this proceeding. In this posture of the case we need not consider the alternative contention of petitioner Field that any amounts paid to him were distributions out of the capital of petitioner General Spring. There remains for consideration, however, his claim to the benefits of section 107. An examination of the language of the back-pay provisions of section 107 (b) and of the regulations issued thereunder convinces us that the claim under this subsection must be rejected. The definition of "back-pay" *196 contained in section 107 (d) (2) includes the condition that payment would have been made sooner but for events including "(i) bankruptcy or receivership of the employer * * * (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary * * *." Only those two are of possible present application. Since there was here no actual bankruptcy or receivership the sole question is whether the situation was "similar in nature" within the meaning of subsection (iv). As authorized if not required by the express statutory provision, respondent has issued regulations bearing specifically upon the aspect of similarity. Those regulations in turn exclude from back-pay "remuneration paid in the current year in accordance with the usual practice or custom of the employer even though received in respect of services performed in a prior year or years" and also "additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation." Regulations 111, section 29.107-3. It is petitioners' contention that the payments in question were for services rendered in prior *197 years and the record shows that the resolutions authorizing the payment consistently attempted to make provision for payment for past services. Our findings show that effort was made thereby to cover all of the years of the employer's existence. Even if that aspect were debatable the resolutions are in each case carefully drawn to eliminate any possibility that there would be any prior enforceable agreement or other prior legal obligation to make the payments in question. Unless and until the employer's earnings were adequate, there was no obligation; and as to the years for which the back-pay is claimed, it is not only conceded but contended that such earnings were not present until many years thereafter. There was, as we have said, no actual bankruptcy or receivership. And unlike the situation in Langer's Estate v. Commissioner (C.A. 9), 183 Fed. (2d) 758, reversing 13 T.C. 419, it cannot be said that "the only element of legal bankruptcy lacking was a formal judicial declaration * * *." See also Sedlack v. Commissioner ( C.A. 7), 203 Fed. (2d) 825, reversing 17 T.C. 791. There is no indication that the liabilities of the *198 corporation exceeded its assets at any time. General Spring retained as its principal asset the contract with Grinnell. There is no evidence as to its value, but considering that General Spring collected under it in one year over $200,000, it must have been considerable. With such a figure on the asset side of the ledger there is nothing in the record to show that the liabilities, even including any potential liability to General Spring's officers, were so great as to exceed the corporation's assets. And this is particularly true in view of the fact that there was never any obligation enforceable in law or in a court of bankruptcy to pay the salaries in question until the sums for that purpose were available. This not only fails to bring the circumstances within the language and purpose of the statute and the regulations issued in conformity therewith, but demonstrates affirmatively that no such situation as a bankruptcy or receivership, or anything similar to it, is to be assumed here. It follows that the claim that payments were made to Field as back-pay must be rejected. It likewise seems clear that 107 (a) relating to services covering more than 36 months is inapplicable. The *199 figures show that even if the section were otherwise germane much less than 80 per cent of the compensation attributable to Field's services was received in the taxable year. [2] The services must be considered as unitary and as extending at least through 1943. Ralph E. Lum, 12 T.C. 375; Julia C. Nast, 7 T.C. 432. The claim for overpayment on behalf of petitioner Field must be rejected. Decisions will be entered under Rule 50. Footnotes
1. The year 1942 is also involved because of the forgiveness feature of the Current Tax Payment Act of 1943.↩
2. Amounts paid to Field for services performed since 1928 ↩
Year of
Payment
Amount
1937
$ 5,200
1938
5,200
1939
2,600
1940
8,000
1941
22,000
1942
30,500
Total
$ 73,500
1943
73,500
Grand total
$147,000