244 F.2d 634
 57-1 USTC P 9677, 113 U.S.P.Q. 356
 Ernest E. ROLLMAN and Hilda S. Rollman, Curt E. Kaufman and
Louise Kaufman, Heinz W. Rollman and Tania
Rollman, Walter Kaufman and Ellen
Kaufman, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 7318.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 11, 1957.
Decided May 8, 1957.
 
 David Alter, New York City (Squadron & Alter, New York City, on the brief), for petitioners.
 Morton K. Rothschild, Atty., Dept. of Justice, Washington, D.C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Hilbert P. Zarky, Attys., Dept. of Justice, Washington, D.C., on the brief), for respondent.
 Before PARKER, Chief Judge, SOPER, Circuit Judge, and WARLICK, district judge.
 SOPER, Circuit Judge.
 
 
 1
 This petition to review decisions of the Tax Court involves deficiencies in income taxes for the years 1948 and 1949 aggregating about $5400. The question presented is whether payments received in these years by a partnership, of which the taxpayers were members, for the transfer of rights in a patent owned by the partnership should be regarded as proceeds of sale of capital assets under § 117 or ordinary income under § 22(a) of the Internal Revenue Code, 1939, 26 U.S.C. §§ 117, 22(a).
 
 
 2
 The taxpayers, Ernest Rollman, Heinz Rollman, Curt Kaufman and Walter Kaufman are members of a partnership known as 'The Rollmans', presently engaged in business at Waynesville, North Carolina. The Rollmans was first formed as a partnership in Belgium in 1936. Prior to that time, the taxpayers had lived in Germany and had been there employed in several shoe factories owned by Hans Rollman, an original member of The Rollmans, now deceased. While so employed, taxpayers had become skilled in the production methods of leather and rubber shoe manufacture. Taxpayers and their families fled to Belgium in 1935 following the confiscation of their properties, including shoe factories, equipment and patents, by the Hitler regime in Germany. In Belgium, the taxpayers, being unable for lack of funds to engage in the manufacture of shoes but famous for their skill in this field, formed The Rollmans whose business consisted of giving technical advice to shoe manufacturers and granting limited licenses to such manufacturers for the production of shoes under patents developed by the partnership. This business has continued up to the present time.
 
 
 3
 On September 6, 1938, there was granted to the partnership United States Patent No. 2,129,106 which is known as the Rajeh patent and relates to footwear with a new type of sole consisting of a dense rubber outer sole united by a body of sponge rubber to the upper portion of the footwear. In 1939, The Rollmans, being desirous of establishing a business in the United States, assigned certain patents, including the Rajeh patent, to Heinz Rollman, a member of the partnership and one of the taxpayers, with authority to dispose of them and to execute agreements on behalf of the firm. Heinz first attempted to arrange with one Leo Weill and later with Rikol, Incorporated, a corporation controlled by Weill, for the manufacture of shoes under the technical direction of The Rollmans and under a license under the Rajeh patent. These negotiations were unsuccessful largely because the manufacture of shoes under the patent required not only special shoe machinery but a supply of an uncured rubber compound which would involve the use of machinery costing about $250,000. Rikol could not supply the necessary money and consequently negotiations were undertaken between Rikol, Heinz representing The Rollmans, and the Dayton Rubber Company, looking to the building of a rubber plant by Dayton, the leasing of space to Rikol, and the supply of Rikol's requirements for the rubber compound for manufacturing operations under the patent. Dayton was unwilling to make the investment until it had investigated the Rajeh patent and had reviewed a proposed agreement for the grant of a limited license under the patent to Rikol. Dayton at that time was contemplating a complete transfer of all rights under the patents to Rikol in order to safeguard the proposed investment. The investigation disclosed a possible conflict with patents owned by one Ludwig H. Grunebaum and his associates, which had been acquired by them after the German Government confiscated The Rollmans' outstanding United States patents in 1935. As a result of this investigation, an arrangement was made for a transfer of the Grunebaum patent rights along with the transfer of the Rajeh patent, and an agreement was entered into on December 19, 1940, between Heinz, acting on behalf of the partnership, Grunebaum and Rikol, wherein Rollman and Grunebaum warranted that Grunebaum was the owner of United States Patents No. 1,955,720 of 1934 and No. 2,168,243 of 1939 relating to shoes and the manufacture thereof, sometimes referred to as The Rollman patents; that Rollman had full authority to act on behalf of Grunebaum in granting licenses under said patents; and that The Rollmans were the owners of United States Patent No. 2,129,106 of 1938, known as the Rajeh patent. Said agreement then set out the following mutual promises and covenants:
 
 
 4
 'Rollmann, individually and as a member of the copartnership, and Grunebaum do hereby respectively grant to Rikol, subject to the conditions hereinafter set forth, an exclusive license (except for two nonexclusive licenses now outstanding in United States Rubber Products, Inc., and Pirelli, Ltd.) for the manufacture and sale of shoes pursuant to all of the above mentioned patents and any renewals, continuations, divisions, reissues or extensions thereof. Said license shall extend to the entire territory of the United States of America, and so long as Mr. Leo Weill, the representative of Rikol, shall remain alive and shall remain holder of a majority of the stock of Rikol, shall likewise extend to the possessions and dependencies of the United States of America.
 
 
 5
 'It is understood that a contract shall be entered into between Rikol, or a subsidiary or affiliated company of Rikol, with a rubber company to supply rubber mixture and semi-vulcanized sole shells. It is understood that said contract will be negotiated by Mr. Leo Weill, as the representative of Rikol, in conjunction with Rollmann and that said contract shall be approved by Rollmann before its execution. Upon the execution of a contract as aforesaid, Rollmann agrees to place at the disposal of the management of said rubber factory all of the formulas necessary for the manufacture of the rubber materials needed by Rikol in order to fully exercise the license granted to it under the patents mentioned herein.
 
 
 6
 'The license herein granted to Rikol shall be exclusive for the duration of this agreement with respect to the Rajeh Patent, and shall be exclusive with respect to the Rollmann Patents, except for the nonexclusive license possessed by the United States Rubber Products, Inc. and Pirelli, Ltd., Rollmann and Grunebaum herein agreeing that except for the two non-exclusive licenses above mentioned, no other licenses will be granted with regard to said patents during the term of this agreement. Rollmann and Grunebaum do hereby agree that the license heretofore granted to Pirelli, Ltd., and the United States Rubber Products, Inc. will not be renewed and that no other party will be substituted in place of Pirelli, Ltd. or the United States Rubber Products, Inc. in the event of a cancellation or other termination of said license or licenses. The patents hereinbefore named are licensed solely and exclusively to Rikol (excepting United States Rubber Products, Inc. and Pirelli, Ltd.), subject to the conditions as set forth in this agreement. * * *
 
 
 7
 'Rikol agrees that it will not grant sub-licenses with respect to the patents for which licenses are herein granted, or any improvements or developments with regard thereto; unless it shall first receive the written consent of Rollmann thereto; except, however, that Rikol shall have the right to grant licenses to any corporations or other enterprises in which Leo Weill shall directly or indirectly control a majority of the stock. In any event it is understood and agreed that Rikol shall have the right to assign the within agreement to a corporation to be formed, provided that Leo Weill shall directly or indirectly control at least a majority of the stock of such new corporation, and upon such new corporation assuming in writing all of the terms and provisions of the within agreement on Rikol's part to be performed, Rikol shall be released from any and all further liability hereunder.'
 
 
 8
 Subsequently, on March 19, 1941, Leo Weill organized the Wellco Corporation and thereafter controlled both Rikol and Wellco. On the same date Rikol entered into an agreement with Wellco, granting the exclusive sub-license to manufacture and sell shoes pursuant to the two above mentioned United States patents under the two United States Rollman patents, formerly belonging to the Grunebaum group, for which exclusive licenses had been granted to Rikol under the agreement of December 19, 1940. The later 1941 agreement recited that in the earlier agreement Rikol had 'obtained a license with respect to the use' of the so-called Rollman patents.
 
 
 9
 No further agreements were made in the United States with respect to the Rajeh patent or any improvements thereon by either Rikol or The Rollmans.
 
 
 10
 During 1947, 1948 and 1949, The Rollmans received payments pursuant to the agreement of December 19, 1940, in the amounts of $9,417.77, $20,178.03 and $17,900.69, respectively. It reported these amounts on its Federal income tax returns as long-term capital gain from the sale of an asset. The Commissioner, however, held that these payments constituted ordinary income to The Rollmans and, in accordance with this ruling, adjusted the taxpayers' distributable shares of ordinary income from the partnership for the taxable years. The Tax Court sustained this conclusion on the ground that the transfer of December 19, 1940 was not a grant of all the substantial rights of The Rollmans under the Rajeh patent. The Court found it unnecessary to consider the additional contention of the Commissioner that the patent was not a capital asset in the hands of The Rollmans because it had been held primarily for sale to customers in the ordinary course of business.
 
 
 11
 The Tax Court reached the conclusion that there was not an assignment and sale of patent rights in the pending case because the patent statute confers upon an inventor the exclusive right to make, use and vend the patented articles, whereas the transfer described in the contract of December 19, 1940, conveyed only the right to make and sell the articles and made no mention of the right to use them. For the significance of this omission the Tax Court relied primarily on the decision of the Supreme Court in Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923, in which it was held that a transfer of rights under a patent to manufacture and sell, but not including the right to use, the patented article in the United States conferred no right upon the licensee to sue an infringer. The Court was concerned with the procedural problem rather than the nature of the right conveyed, but declared in the course of the discussion that the grant did not amount to an assignment of title but only to a mere license because of the omission of the right to use. In a number of tax cases in the Tax Court and in other courts, this decision has been strictly and literally followed as authority for the rule that money paid for a grant of a right to manufacture and sell, without the right to use, a patented article is not to be regarded as the proceeds of a sale of capital assets subject to the capital gains tax, but as ordinary income; and in most of the decisions the rule has been applied without comment upon the fact that the Waterman case had no concern with tax statutes.[1]
 
 
 12
 However, neither the Tax Court nor the other courts have felt obliged in every case to apply strictly the dicta of the Waterman decision without regard to the objective realities of the cases before them. In so doing they have followed the settled rule stated in all the cases, that it is not the name or form of an agreement but its true nature which controls its legal effect. Thus, in United States v. Carruthers, 9 Cir., 219 F.2d 21, in a suit to recover income tax wrongfully assessed, the court had under consideration an agreement in which the taxpayer granted to a corporation an exclusive license to manufacture, use and sell machinery and to practice the methods set forth in certain patents but limited the licensee to the use of the patents in a single industry; and it was argued by the Commissioner that this arrangement, since it did not conform to the Waterman rule, was not a transfer of title to the whole patent, and hence the conveyance was a license and not a transfer of capital assets; but the Court held that it was not obliged to follow literally the test announced in the Waterman infringement suit, particularly as the weight of the testimony showed that the patents had no established value for use in any other industry.
 
 
 13
 Again, in Commissioner of Internal Revenue v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339, the Court affirmed the conclusion of the Tax Court that a transfer of capital assets had taken place by reason of and agreement to assign certain patented processes to the purchaser with full and exclusive right and authority to manufacture and sell in the United States. This agreement was followed by a formal assignment whereby the exclusive right, title and interest in the patents within the described territory was assigned. It was taken for granted that the formal assignment of the whole title to the patent confirmed the purpose of the original agreement and no mention was made of the omission therefrom of the right to use the patented processes.
 
 
 14
 Very recently, on March 21, 1957, it was held in a tax case by the Fifth Circuit, that a transfer of the exclusive right to manufacture and use and lease, but not to sell, a patented service tool designed for the removal of obstructions from oil wells was a conveyance of all the substantial rights under the patent since the evidence showed that in the trade such tools can only be used by trained operators and are withheld from sale so as to protect the reputation of the device. See Lawrence v. United States, 5 Cir., 1057, 242 F.2d 542.
 
 
 15
 The Tax Court itself has not always adhered strictly to the Waterman rule. Thus in Parke, Davis & Co. v. Commissioner, 31 B.T.A. 427, which the Fifth Circuit followed in the last mentioned case, the taxpayer was a manufacturer of chemicals which had bought a patent covering machines designed to make and fill capsules; and, in consideration of one-half the purchase price of the patent, it assigned to another manufacturer of chemicals the exclusive right and privilege to manufacture, and have manufactured for its exclusive use, and to use, but not to sell, the inventions covered by the patents. The taxpayer reserved similar rights and privileges to itself, and it was agreed that neither company should assign rights under the patent to a third person without the consent of the other. Overruling the contention of the Commissioner that under the Waterman case the agreement was a license and not a sale, the Court said:
 
 
 16
 'In none of the cited cases did the court have the situation here existing. The questions there presented were entirely different from the one before us for decision. The right to maintain a suit at law is often controlled by the question of the possession of the naked legal title. Here we have a question of income tax liability where legal title is of little consequence and the inquiry is as to the ownership of the beneficial interest. We are not to determine whether petitioner or Eli Lilly & Co. could maintain a suit for infringement in its own name, but merely whether petitioner, under its contract with Eli Lilly & Co., divested itself irrevocably of certain capital investments in consideration of the payment made to it by the latter company. If this is the fact, then the transaction for income tax purposes is no more than a conversion of capital.'
 
 
 17
 Again, in the recent case of Rose Marie Reid v. Commissioner, 26 T.C. 622, the Court held that a transfer of the right to utilize certain design patents in the manufacture and sale of the licensee's products was an assignment of property rights and not a mere licensing. The decision was made notwithstanding the failure of the agreement to include expressly the word 'use', since the Court was satisfied from reading the entire agreement and considering the surrounding facts that the parties intended that the taxpayer should assign all of her rights under the patents to the licensee. The record indicated that the agreement was reached as a means of settling certain controversies which had arisen between the parties to the contract.
 
 
 18
 We think that in the pending case, also, the intention of the parties to the agreement of December 19, 1940, to convey to Rikol the right to make full use of the patent is clearly manifest. The agreement was made in order to give The Rollmans a start in this country, and since they did not have command of sufficient funds, they divested themselves of the right to manufacture and sell footwear under the patent and granted this right to a corporation controlled by an independent third party. These rights seem to us to amount to full and complete control, for the omission from the contract of the express right to use the patented article did not in any way limit or restrict Rikol in its operations under the patent, or reserve any right of practical value to The Rollmans. No one in the pending case has ventured to suggest what use The Rollmans can make of the shoes manufactured under the patent other than to wear them; but this was a right to which every purchaser from Rikol was entitled to enjoy; nor has any one been able to suggest what use the manfacturers could make of the footwear and of the patent rights other than to manufacture the shoes and sell them to the general public.
 
 
 19
 It is significant that both Rikol and Wellco had no doubt of Rikol's right to use the patents covered by the agreement of December 19, 1940, because in the subsequent agreement between them of March 19, 1941, it was stated in the recitals that in the earlier agreement Rikol had 'obtained a license with respect to the use' of the Rollman patents.
 
 
 20
 The situation is not like that before the Tax Court in Parke, davis & Co., where the right to use a patented machine in the manufacture of capsules was distinguishable from the right to sell the machine to third parties. Nor is the situation like that in Broderick v. Neale, 10 Cir., 201 F.2d 621, where the owner of the patent granted the right to manufacture and sell certain appliances that were usable in outside telephone construction and maintenance work, but limited the grant to manufacture and sale, omitting the right to use. The facts showed that at the time of the grant certain of the patented appliances were in existence which were available to the owner of the patent for use in the work in which he was engaged. In the pending case, the right to manufacture and sell footwear to the general public necessarily involves the right to use the patented articles for all practical purposes.
 
 
 21
 The Tax Court based its decision not merely on the omission from the agreement of December 19, 1940 of the express right to use the patented items but also upon the prohibition which restricted Rikol in the granting of sub-licenses to other corporations. Speaking of the agreement, the Tax Court said:
 
 
 22
 '* * * It permits Rikol to assign the contract only to a corporation to be formed provided the corporation is directly or indirectly controlled by Leo Weill. It does not allow Rikol to license or permit the use of the patented process by other than enterprises controlled by Weill for the manufacture of shoes to be sold by Rikol or its assignee controlled by Weill. The transfer, therefore, was not a grant of all the substantial rights of The Rollmans under the Rajeh patent.'
 
 
 23
 Actually, the agreement provides that Rikol will not grant sub-licenses under the patents mentioned therein, unless it shall first receive the written consent of The Rollmans. In addition, Rikol is goven the right to grant sub-licenses to corporations controlled by Wellco. The authorities do not support the view that the grant of exclusive rights under a patent does not amount to a transfer of a capital asset if the assignee cannot grant a sublicense without the assignor's consent. Such a limitation does not interfere with the full use of the patent by the assignee and it serves to protect both parties to the assignment in case the purchase price is paid in instalments. Moreover, the assignor retains no use of the patent for himself by reason of the limitation since he has granted the exclusive rights to the assignee and cannot grant a sub-license without the purchaser's consent. See Allen v. Werner, 5 Cir., 190 F.2d 840; Watson v. United States, 10 Cir., 222 F.2d 689; Platt v. Fire-Extinguisher Mfg. Co., 3 Cir., 59 F. 897; Crook v. United States, D.C., 135 F.Supp. 242; First National Bank of Princeton v. United States, D.C., 136 F.Supp. 818; Parke Davis Co. v. Commissioner of Internal Revenue, 31 B.T.A. 427, 430; General Spring Corp. v. Commissioner of Internal Revenue, 12 T.C.M. 847.
 
 
 24
 The purchase price to be paid by Rikol for rights under the Rajeh patent was fixed by the agreement of December 19, 1940, at 3 per cent of the total net cash receipts from sales of the shoes made and sold by Rikol; and on this account the Commissioner makes the additional contention, which was not considered in the opinion of the Tax Court, that the transfer did not amount to a sale. Aside from Bloch v. United States, 2 Cir., 200 F.2d 63, which involved a non-resident taxpayer, the weight of authority is clearly against this contention.[2]
 
 
 25
 In Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406, it was expressly held that the transfer of full and complete title to patent rights constituted a sale of capital assets although the contract provided for instalment payments of the purchase price based upon a percentage of the manufactured units; and this view was hald by the Commissioner until 1950, as will appear from Mimeo, 6490, 1950-1, C.B. 9. In this ruling the Commissioner acknowledged his prior acquiescence in Myers v. Commissioner, 6 T.C. 258, but as of March 20, 1950, withdrew his acquiescence as to royalties received from exclusive license agreements for the taxable years beginning after June 1, 1950. Nevertheless, the acquiescence remained in effect as to the taxable years 1947, 1948 and 1949 at issue in the pending case.
 
 
 26
 In 1954, Congress rejected this ruling of the Commissioner by enacting § 1235(a) (1)(2) of the Internal Revenue Code of 1954, 26 U.S.C. 1952 ed., Supp. I § 1235, which provided that a transfer of all substantial rights to a patent shall be considered a sale of exchange of a capital asset held for more than six months regardless of whether or not payments in consideration of the transfers are made periodically over a period coterminus with the transferee's use of the patent, or contingent upon the productivity, use or disposition of the property transferred.
 
 
 27
 In 1955, the Commissioner issued a ruling, Rev.Rul. 55-58, C.B. 97, interpreting this statute to apply only to payments received in 1954 and subsequent years but not to apply to amounts received in taxable years beginning after May 31, 1950 and before January 1, 1954, and accordingly announced that payments received by inventors for the taxable years after May 31, 1950, would be regarded as ordinary income. See Mimeo, 6490, 1950-1, C.B. 9. It appears also from this ruling that the Commissioner's acquiescence as to the tax years 1947, 1948 and 1949 still prevailed.
 
 
 28
 In response to this ruling of the Commissioner, Congress in 1956 enacted § 117(q) of the Internal Revenue Code of 1939 (70 Stat. 404) in substantially the same terms as the Act of 1954 and provided that the statute should be applicable to any payment made pursuant to a transfer of patent rights in any taxable year beginning after May 31, 1950, regardless of the year in which the transfer occurred. It is contended that since these statutory provisions are expressly made applicable to years subsequent to May 31, 1950, they did not apply to 1947, 1948 and 1949, the taxable years in the instant case. We do not think this contention is tenable. It seems obvious that the Acts of 1954 and 1956 were designed to overrule the position taken by the Commissioner and were not designed to change the law laid down in these decisions of the courts.
 
 
 29
 Decisions of the courts in 1955, subsequent to the passage of the Act of 1954, applied the old rule without reference to that statute. See Watson v. United States, 10 Cir., 222 F.2d 689 and United States v. Carruthers, 9 Cir., 219 F.2d 21, both of which involved payments in 1950 and were decided in 1955. We are in accord with the overwhelming weight of authority that the payment in instalments of the purchase price for an assignment of patent rights, as in the pending case, does not prevent the transaction from being a sale of capital assets.
 
 
 30
 By additional brief filed subsequent to the argument in this court the Commissioner raises the point that the transfer of the Rajeh patent was not a sale of all the substantial rights therein because the assignment was made subject to prior assignments to other persons. There is no need to discuss this contention because it is based upon an incorrect statement of the facts. It clearly appears from the agreement of December 19, 1940, that the United States patents to Grunebaum, No. 1,955,720 and No. 2,168,243, were granted subject to prior licenses to the United States Rubber Products Company, Inc. and Pirelli, Ltd., but these prior licenses had no reference to and did not cover the Rajeh patent.
 
 
 31
 The Commissioner makes the additional point that even though the transfer of the patent constituted a sale, nevertheless, it was not a sale of a capital asset within the meaning of § 117(a) of the 1939 Code, because it constituted a sale to customers in the ordinary course of The Rollmans' trade or business, which is excluded by the express terms of the section. Since the Tax Court held that the transfer was not a grant of all the substantial rights of The Rollmans in the patent it found it unnecessary to consider this contention and made no findings in respect thereto. The Commissioner urges that, in case the Tax Court's decision is reversed on the main point, the case should be remanded to the Tax Court to determine this additional contention. Our attention has not been directed to any substantial evidence indicating that the transfer of the Rajeh patent was made in the course of the taxpayers' business, but since the Tax Court made no findings in respect thereto its decision will be reversed and the case remanded for further proceedings, not inconsistent with this opinion.
 
 
 32
 Reversed and remanded.
 
 
 
 [1]
 Kimble Glass Co. v. Commissioner, 9 T.C. 183; Cleveland Graphite Bronze Co. v. Commissioner, 10 T.C. 974, affirmed per curiam on the Tax Court's Opinion, 6 Cir., 177 F.2d 200; Gregg v. Commissioner, 18 T.C. 291, affirmed per curiam on the Tax Court's Opinion, 3 Cir., 203 F.2d 954; Broderick v. Neale, 10 Cir., 201 F.2d 621
 
 
 [2]
 Myers v. Commissioner, 6 T.C. 258; Kimble Glass Co. v. Commissioner, 9 T.C. 183; Commissioner of Internal Revenue v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339; Allen v. Werner, 5 Cir., 190 F.2d 480; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406; Watson v. United States, 10 Cir., 222 F.2d 689; United States v. Carruthers, 9 Cir., 219 F.2d 21; First National Bank of Princeton v. United States, D.C., 136 F.Supp. 818