Clyde E. BANNISTER and Wife, Alwylda
M. Bannister,

v.

UNITED STATES of America

Civ. A. No. 10458.

United States District Court
S. D. Texas,
Houston Division.

Feb. 28, 1958.

Dougal C. Pope, Houston, Tex., for plaintiff, Clyde E. Bannister and wife, Alwylda M. Bannister.

William B. Butler, U. S. Atty., and Newton B. Schwartz, Asst. U. S. Atty., Houston, Tex., for defendant, United States.

CONNALLY, District Judge.

This action is one to recover income tax payments which allegedly were unlawfully and illegally assessed and collected for calendar years 1949, 1950 and 1951. There is a stipulation of record covering many of the facts, and others appear without dispute in the evidence. The controlling question calls for the interpretation of an assignment or licensing agreement of certain patent rights, and the determination whether, under terms of 26 U.S.C.A. § 1235(a) the rights retained by the assignor were "substantial." If so, the payments to the assignor-licensor constitute ordinary income (the basis on which the tax was paid); if the rights retained by the assignor-licensor were unsubstantial, the transaction constituted a sale, and the payments thereunder were entitled to capital gains treatment.

The taxpayer and plaintiff here is C. E. Bannister,[1] an inventor. For a period of many years following 1925 the plaintiff undertook to perfect a so-called "rubber hose drilling system" for the drilling of oil wells. This device differed from the conventional rotary drilling rig in many particulars, among the most important being that the plaintiff's device was suspended in the hole by a flexible cable and that in drilling, the bit did not rotate continuously in the same direction, but, with an oscillating motion, made a half turn in a clockwise direction, followed by a half turn in a counter-clockwise direction. It was thought by some that the idea had great promise.

On November 26, 1927, Bannister entered into a contract with Mike Hogg, a financier and oil operator of this city. The contract is in evidence, and I make reference thereto. In brief, it provided that Hogg would advance funds from time to time for the necessary experimentation and work by Bannister in his efforts to perfect the operation of the machine and related devices; Hogg was to pay a modest salary to Bannister; Bannister agreed to assign to Hogg all of his rights in and to such patents as might be awarded him in connection with the drilling machine or related devices, which assignments would be placed in escrow with the First National Bank of Houston. These patents might be withdrawn from the escrow agent by Hogg on his payment of $500, in which event Hogg became obligated to create a corporation with a capital stock of not less than $100,000 for the exploitation of such patents, to which corporation the patent rights were to be assigned. Eighty percent of such corporation was to be owned

---

1. His wife, Alwylda M. Bannister, likewise is a party plaintiff.

by Hogg and twenty percent by Bannister. The contract was for a period of six months, but provided for renewal from time to time by Hogg.

The contract was extended periodically from that time until 1937. During the period of the contract and its several extensions Hogg advanced, and Bannister expended, some $200,000 in efforts to perfect the drilling system. Additionally Bannister deposited with the escrow bank a number of patents which he received during this interval. Among this number was Patent No. 1,955,166, the sale (or license) of which gives rise to the present controversy.

This patent had been granted April 17, 1934, and concerned a device for the taking of cores or samples from wells during the drilling process. The device then in use was one which required that the drill and the string of pipe to which it was affixed be removed from the hole; the device was then lowered in the hole to the desired depth; and by means of an electric impulse a projectile was fired into the formation at the side of the well. The projectile was hollow, and a portion of the formation was forced into the hollow nose of the projectile; this in turn was retrieved at the mouth of the well and the sample removed. Such a device was in wide use by Schlumberger Oil Well Surveying Corporation (and perhaps by others) who did a large and lucrative business serving the drillers of oil and gas wells in this manner.

Bannister's device differed in that it did not require that the pipe and bit be removed from the hole; rather, the projectile was fired through an opening in the bit. The projectile which was fired into the formation was hollow and secured the sample within its cavity in much the same fashion. However, the mechanism was triggered by mechanical means

rather than by electric impulse, and the projectile was retrieved in a different fashion.

On July 15, 1935, Bannister entered into an agreement with Schlumberger Well Surveying Corporation [2] concerning the use by the latter of this device. It is this contract which calls for interpretation here. Reference is made to it in its entirety. In salient part, it provided as follows: (1) Bannister granted to Schlumberger an exclusive [3] non-divisible and non-assignable license to Claims 10, 11, 12, 13, 14, 15 and 19, only, of the patent.[4] (2) Schlumberger might not use the device (a) in association with a drilling bit, or (b) while the bit was in the hole, and (c) not in wells drilled in whole or in part by use of the Bannister rubber hose drilling system. (3) Bannister retained the right to use the device in connection with his rubber hose drilling system. (4) Schlumberger agreed to pay Bannister 7½% of its gross income from the use "of a sample-taking device covered entirely or in part by the said patent." (5) Bannister reserved the right on thirty days notice to cancel the exclusive feature of the license to Schlumberger, in which event Schlumberger was to reduce the royalty payment from 7½% to 5% of its gross income from this source.

After acquiring these rights, Schlumberger never made or used a single device under the Bannister patents. It continued to carry on its thriving business using its own device. An officer of Schlumberger testified that his company never had any intention of using the Bannister device, for it considered its own to be superior; but had acquired the license to use the seven claims thereunder simply to forestall any claim of patent infringement by Bannister. From the date of the contract until the expiration thereof

2. This contract was with the knowledge and consent of Hogg and one Christian. The latter owned a small interest in the Bannister-Hogg patents and contractual agreements by reason of having brought the parties together.

3. As will appear later, this was something of a misnomer.

4. Twenty claims were advanced for the patent.

(on expiration of the patent in 1951) payments were made by Schlumberger to Bannister.

The Hogg-Bannister contract, with the advances of money by Hogg and continued experimentation by Bannister, continued into 1937. As Hogg was tiring of the continued expense, these two entered into a contract with Phillips Petroleum Company April 5, 1937. The effect of this contract was that Phillips made the advances of funds for Bannister's work, and, if same proved desirable, were to acquire an interest in the patents. This arrangement was terminated by Phillips May 10, 1939.

Hogg had made no advances during the period of Phillips' activity, and did not desire to continue as before after Phillips terminated. At this point he and Bannister came into dispute as to the ownership of the patents then in escrow at the bank. On May 23, 1939, Hogg tendered $500 to the First National Bank and demanded delivery to him of the patents then held, as required by the original Hogg-Bannister contract. The bank accepted the money and made the delivery.

Shortly thereafter, Hogg and Bannister resolved their differences. This was effected by the execution of a number of instruments August 21, 1939. The effect of the several instruments (all of which are in evidence and to which I refer) was that Hogg, Bannister and Christian each released the others from claims arising out of the original contract and its extensions and their activities thereunder; Hogg and Christian assigned to Bannister all of the patents other than No. 1,955,166 (being the one licensed or assigned to Schlumberger). The three, Hogg, Bannister and Christian, recognized that they did then, and had at all material times, owned the patent in question in the ratio of 47½%,

47½% and 5%, respectively, and were entitled to the proceeds from the Bannister-Schlumberger agreement in that ratio. As all payments theretofore had been from Schlumberger to Bannister, Schlumberger was notified thereafter to make all payments to Hogg and Christian until they had received amounts to which their proportionate shares entitled them; and thereafter payments were to be made in the proportion hereinabove stated.

During the three years 1949 to 1951, inclusive, the payments to Bannister from Schlumberger under the circumstances hereinabove set out total some $260,000. In each instance, as stated, he returned same as ordinary income and paid the tax calculated in this fashion. He now contends that under the Bannister-Schlumberger contract of July 15, 1935, he made a transfer of all "substantial rights" to the patent which entitled him to capital gains treatment. Alternatively, and if it be determined that a sale was not made by virtue of the contract just mentioned, taxpayer further contends that his settlement agreement with Hogg and Christian in 1939, and recognition of his ownership of a 47½% interest in the patent, effected a sale of his interest as of that date.

 Recognizing that the retention of bare legal title in itself is not significant, and that the realities of the situation must control;[5] that interests of varying kind retained by an assignor from time to time have been held by the authorities to be "unsubstantial" within terms of the statute,[6] and that the statute should receive a liberal interpretation in view of the Congressional attitude favorable to the inventors which it evidences;[7] nevertheless I am clearly of the view that the plaintiff here may not prevail. The interest which Bannister retained under the Schlumberger con-

5. Storm v. United States, 5 Cir., 1957, 243 F.2d 708.

6. Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840; Parke, Davis & Co. v. Commissioner, 31 B.T.A. 427; Kavanagh v. Evans, 6 Cir., 1951, 188 F.2d 234.

7. Roe v. United States, D.C., 138 F.Supp. 567.

tract was not only substantial, but was the major portion of the whole.

First, the so-called "exclusive" interest assigned to Schlumberger was not exclusive at all, save for a thirty-day period. The option lay with Bannister, on such notice, to cancel this feature of the contract, after which time he might have assigned to any number of third persons an equal or greater interest than Schlumberger held. Additionally, one characteristic peculiar to the Bannister device, and considered to be one of its principal advantages, was its utility while the drill bit and pipe were in the well. Schlumberger was denied the right to use the Bannister device under these circumstances. And finally, when the contract and the circumstances of the parties thereto, are examined from their four corners, the transaction has none of the characteristics of a sale of a patent. Schlumberger never intended to manufacture, to use, or in any way to exploit this device. Schlumberger intended only to continue using its own; but by means of acquiring seven of the twenty claims advanced for the Bannister tool (covering the aspects of similarity to their own), in effect, Schlumberger bought its peace, in advance, against potential claims of patent infringement.

■■ There is no merit to the alternative contention that a sale of some character of the Bannister interest was effected when settlement was made with Hogg and Christian in 1939. Nor may the plaintiff take advantage of such contention as it was not advanced in the claims for refund and there was no waiver by the government of their right under that rule.[8]

The income in question properly was taxed as ordinary income. Judgment will go for the defendant. The foregoing is adopted as findings of fact and conclusions of law.

---

8. Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 17–18, 60 S.Ct. 371, 84 L.Ed. 542, and cases there cited.