**Clyde E. BANNISTER and wife, Alwylda M. Bannister, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 17273.**

United States Court of Appeals
Fifth Circuit.

Dec. 23, 1958.

Dougal C. Pope, Houston, Tex., for appellants.

Davis Morton, Jr., Helen A. Buckley, Grant W. Wiprud, Lee A. Jackson, Wash-

ington, D. C., Charles K. Rice, Asst. Atty. Gen., William B. Butler, U. S. Atty., Newton B. Schwartz, Asst. U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

This appeal from a judgment and decision [1] of the United States District Court for the Southern District of Texas, holding that amounts which the petitioners received during the taxable years 1949, 1950, and 1951, from a patent were royalty income, taxable as ordinary income and not, as petitioners had claimed, proceeds from the sale of the patent or an interest in it, taxable as long term capital gains, presents for decision a single question whether the appellants sold their patent, a capital asset, or an interest in it, or whether they merely granted a license to it. Putting it another way, the question presented for decision is whether, as was held below, "the interest which Bannister retained under the Schlumberger contract was not only substantial but was the major portion of the whole".

The district judge correctly stated in his opinion:

"There is a stipulation of record covering many of the facts, and others appear without dispute in the evidence. The controlling question calls for the interpretation of an assignment or licensing agreement of certain patent rights, and the determination whether, under terms of 26 U.S.C.A. § 1235(a) the rights retained by the assignor were 'substantial.' If so, the payments to the assignor-licensor constitute ordinary income (the basis on which the tax was paid); if the rights retained by the assignor-licensor were unsubstantial, the transaction constituted a sale, and the payments thereunder were entitled to capital gains treatment."

It thus appears that the question decided below and to be decided here is not one of fact but of law, and, since in the opinion the district judge states the facts with complete accuracy and sufficient fullness, it will be sufficient for us to adopt his statement of them and, without attempting a restatement of them here, to draw such attention to any particular fact as is pertinent to the argument.

Petitioners-appellants, presenting their attack upon the judgment in six specifications of error,[2] and bearing down heavily on the leading decision of Myers v. Commissioner, 6 T.C. 258 and the numerous later cases[3] which have followed its teaching urge upon us that the district judge has taken a too narrow and restrictive view of the law and too narrowly applied it to the undisputed facts, and that this is especially so as to the force

---

1. Bannister v. United States, 161 F.Supp. 298, 299.

2. These are that:

(1) The court erred in holding that the interest which appellant retained in the Bannister patent was substantial.

(2) It erred in holding that the interest which appellant retained in the Bannister patent was the major portion of the whole.

(3) It erred in failing to hold that appellant retained no substantial rights in the seven claims covered by the Schlumberger contract.

(4) It erred in failing to hold that appellant retained no substantial rights in the seven claims covered by the Schlumberger contract in so far as the electrical side wall coring industry is concerned.

(5) It erred in failing to hold that appellant retained no substantial rights in the Bannister patent in so far as the electrical side wall coring industry is concerned.

(6) It erred in failing to hold that each seperate claim in a patent is a separate invention.

3. Roe v. United States, D.C., 138 F.Supp. 567; United States v. Carruthers, 9 Cir., 219 F.2d 21; Allen v. Werner, 5 Cir., 190 F.2d 840; Watson v. United States, 10 Cir., 222 F.2d 689; Lawrence v. United States, 5 Cir., 242 F.2d 542; Storm v. United States, 5 Cir., 243 F.2d 708; Rollman v. Commissioner, 4 Cir., 244 F.2d 634; Dairy Queen of Okl., Inc. v. Commissioner, 10 Cir., 250 F.2d 503.

and effect given in the decision to the recent statutory enactments.

Pointing out that those enactments were declaratory of the controlling decisions and insisting that they must be liberally construed in the light of the circumstances of their enactment and the reports accompanying their passage, they argue that the district judge, instead of following the practical construction given by the courts and admonished by the statute, approached and decided the case from an unduly technical and restricted standpoint.

For the reasons hereafter briefly stated, we agree that this is so, and that the judgment must be reversed and here rendered.

For many years, indeed until the opinion in the Roe case, note 3, supra, the commissioner and the courts, in deciding the tax consequences of dealings with patents, held themselves to be strictly bound by the precise holding in Waterman v. MacKenzie, 138 U.S. 252, 11 S. Ct. 334, 34 L.Ed. 923, though the Waterman case dealt not at all with the taxation but with the infringement of patent rights and laid down a test for determining, for the purpose of the right to sue at law for infringement, whether there had been a license or an assignment thereof. United States v. Carruthers, 9 Cir., 219 F.2d 21, citing Allen v. Werner, 5 Cir., 190 F.2d 840, a pre-statute case. Cf.

It took the decision of the tax court in the Roe case and the decisions following to change this and, but for the stubbornness in purpose along with the vacillation in action of the Treasury Department, there would have been no need for the recent legislation. Because, however, the Treasury for a time accepted the later decisions and then denied them, and then accepted and then denied them, leaving in a state of complete uncertainty the tax fate and fortunes of those undertaking to deal commercially with their patents, the Congress in Sec. 1235 of the 1954 Code enacted the first legislation in adoption and support of these decisions; and because thereafter the Treasury undertook to posit its acceptance of the declaratory rule of the statute, not on the fact that it was declaratory but on the assumption that it was derogatory of the controlling case law, and confined its acceptance of the rule to payments received after the passage of the statute, Congress then in 1956 amended Sec. 117 of the 1939 Code to add a subdivision "q" which in substance established the same rule for taxable years beginning after May 31, 1950, 26 U.S.C.A. § 117(q).[4]

While the district judge, reciting that the realities of the situation must con-

---

**4.** The case of Leonard Coplan, 28 T.C. 1189, thus correctly states the reasons why Congress passed the two statutes: "The problem in recent years has sometimes been identified with the Myers case, supra, and the varying administrative positions taken by Internal Revenue Service have revolved around its vacillating determination either to follow or not to follow the Myers case. Shortly after the decision in the Myers case itself the Commissioner announced his acquiescence. 1946–1 Cum.Bull. 3. Thereafter, on March 20, 1950, he withdrew his acquiescence, and substituted a non-acquiescence, but announced that he would not apply the new ruling to royalties received during years beginning prior to June 1, 1950. Mim. 6490, 1950–1 Cum.Bull. 9. Congress thereupon undertook to deal with the problem legislatively in Sec. 1235 of the 1954 Code, which made clear that in certain types of situations an inventor or 'holder' of a patent might obtain capital gain treatment upon disposition of the patent. See Se.Rep. No. 1622, 83d Cong., 2d Sess., pp. 438–441. In effect, Congress approved the Myers decision in the circumstances set forth. Thereupon, the Commissioner issued another ruling, Rev.Rul. 55–58, 1955–1 Cum.Bull. 97, in which he announced that he would apply the new statute to payments received in 1954 and subsequent years, but that he would continue to apply his 1950 ruling to payments received in taxable years beginning after May 1, 1950, and before Jan. 1, 1954. This provoked Congress into taking further action in 1956, and it amended Sec. 117 of the 1939 Code so as to add a new subsection (q), which in substance established the same rule for taxable years beginning after May 31, 1950, as was applicable under the 1954 Code. See H.Rep. No. 1607, 84th Cong. 1st Sess.Int.Rev.Bull., supra, p. 117."

trol did cite many of the cases relied on by appellant, and did declare that the statute should receive a liberal interpretation, it seems to us that, because of the confusion brought on by the Treasury's action, the court below fell into its error. This was that in endeavoring to find in the words of the statute alone the basis for appellants' claim, whereas its real basis was in the case law, of which the statute was more or less declaratory, the court was led into a narrow, instead of a broad, construction, and thereby to deny to the undisputed facts in this case the results which, under the controlling decisions, followed from them.

In other words, instead of viewing the transaction from the broad standpoint of case law and the reasons that lay behind that law, that a person having patent rights or claims to sell and dispose of ought to have the same benefit of capital gains treatment that persons having rights in any other capital asset had, notwithstanding the form in which such sales were cast, the court, over-emphasizing some of the apparently limiting words of the statute and under-emphasizing the declaratory and enabling ones, reached a conclusion as to the law of the case which we think is contrary to the facts on which that conclusion was based.

Stating, "The interest which Bannister retained under the Schlumberger contract was not only substantial, but was the major portion of the whole", the court went on to say:

"First, the so-called 'exclusive' interest assigned to Schlumberger was not exclusive at all, save for a thirty-day period. The option lay with Bannister, on such notice, to cancel this feature of the contract, after which time he might have assigned to any number of third persons an equal or greater interest than Schlumberger held. Additionally, one characteristic, peculiar to the Bannister device, considered to be one of its principle advantages was its utility while the drill bit and pipe were in the well. Schlumberger was denied the right to use the Bannister device under these circumstances.

And finally, when the contract, and the circumstances of the parties thereto, are examined from their four corners, the transaction has none of the characteristics of a sale of a patent. Schlumberger never intended to manufacture, to use, or in any way to exploit this device. Schlumberger intended only to continue using its own; but by means of acquiring seven of the twenty claims advanced for the Bannister tool (covering the aspects of similarity to their own), in effect, Schlumberger bought its peace, in advance, against potential claims of patent infringement."

Instead, then, as we think he should have done, of attaching to the fact that Schlumberger did not intend to use the patent claims but bought them to obtain its peace, the significance, naturally attending such a transaction, that Schlumberger bought and Bannister sold every substantial or effective right which his claims afforded, the court seemed to think that because Bannister engaged in fruitless and costly efforts to make other phases of this patent work, and thus retained his right to those phases, this derogated from the sale of the claims to Schlumberger for the only purpose for which they had value to Schlumberger and, as it turned out, to Bannister himself. We think the court erred also in holding that because Bannister had the option to cancel on thirty days' notice the exclusive interest feature of the contract, this defeated the sale. On the contrary, we think it clear that, as stated by Judge Bratton in Watson v. United States, 10 Cir., 222 F.2d 689, this reservation in no manner changed the fact that there was in fact and in law an effective sale, subject only to an optional condition which was never made effective. Cf. Allen v. Werner, 190 F.2d 840, at page 842, where the court states:

"Nor does the existence in the grantee of the right of cancellation, or the prohibition of unlimited assignment require, under the circumstances here, determination that the

agreement did not evidence a sale." Citing cases.

We think that the necessary conclusion from the facts is not that which the court drew but the contrary, and that the judgment should be reversed and the cause remanded with directions to allow the claims.

Reversed and remanded.

JOHN R. BROWN, Circuit Judge (specially concurring).

I concur in what is done as well as what is so well said in all but the first three out of the last four sentences of the opinion relating to the option to license others.

The contract with Schlumberger expressly provided that for the exclusive "license" a royalty of 7½% would be due. But Bannister was given the express right, on 30 days' notice, to license others, in which case the "royalty" would be 5%. The Court's opinion, on the authority of Watson v. United States, 10 Cir., 1955, 222 F.2d 689, characterizes this as one somewhat in the nature of a condition subsequent.

But it is not necessary to determine whether it is a condition subsequent or whether Watson, as such, is controlling. There, as in similar cases relied on in Watson, the contract, and hence the continuing "royalty" payments constituting the deferred "purchase" price, was to terminate if production by the "licensee" fell below a specified volume. In others the termination flowed from a failure on the part of the vendee-licensee promptly to perform, e.g., make payments, or the like.

But here termination of the exclusive license is not dependent on action or failure of action by the vendee, Schlumberger. It depends on the desire and action of Bannister, the so-called vendor, alone. And this action is in no way dependent on the state of performance or non-performance by the vendee, or even its wishes. It is an absolute right of termination of the exclusive right subject only to the slight condition of a short (30-day) notice. Whatever may be its status

in the conceptual dialectic of contract law, it is plain that within the principles reflected by the cases set forth in note 3, and which Congress has, with unflagging persistence, undertaken to secure despite the intramural opposition of the taxing authorities, there was the ostensible reservation of a valuable and significant right.

Indeed, the difference between an ordinary patent license with the royalties treated as income, rather than an assignment (or sale) with capital gains treatment, is that the assignee-vendee has the *exclusive* enjoyment of the patent rights conveyed. If the same rights (e.g., specified claims, geographical, industry, trade use or application, etc.) are available to others, then it is not a sale or assignment. Here, by express terms, Bannister could let others use it for precisely the same purposes permitted to Schlumberger. That was a reservation of one of the principal attributes of ownership—the right to decide who else might use the invention in the future.

Were it to end there an affirmance of the District Court would, in my judgment, be compelled. But it does not end there. This is so because the record compels the factual conclusion that the reservation was a paper, theoretical right, without any real, substantial, practical, commercial value.

As the opinion so well points out, the patent had only a nuisance value to Schlumberger. Viewed from Bannister's financial point, it might have been better described as an attractive nuisance. This was presumably because the patent may have been the first express disclosure of the use of an explosive in the taking of a core sample. Bannister's patent called for a *bottom*, not a side wall, core. The nature of the apparatus was also such that, unless it were used in conjunction with the Bannister rubber hose drilling apparatus—whose complete lack of functional-commercial utility is the one thing on which Mike Hogg, Phillips Petroleum, Bannister, the Collector and Commissioner of Internal Revenue, the Attorney General and the District Court all agree—it would take extraordinary,

if not Goldbergish, improvisations to use it in connection with a traditional rotary rig drilling setup. Not a little of this improvisation would have been required as to the mechanism for firing the explosive charge since Schlumberger (and perhaps others) had patent rights on the electrical means. And after surmounting all of these difficulties, all a user would have obtained was a bottom hole core—something quite different from what the industry wanted.

It is now a matter of established history that the pudding's proof was in its inedibility. Despite its availability to the oil industry, no one else ever sought the use of this patent. No one ever approached Bannister to request a parallel license with Schlumberger. Bannister never sought out any such prospect. Bannister did not do so because there was and could have been none. That fact stands out like an oil derrick, quite without regard to whether it was the Taxpayer or the Government on whom rested the burden either of proof or of going forward with the evidence.

As the reservation had in fact no real value it becomes insignificant for this case.