H. Fort Flowers v. Commissioner.
H. Flowers v. Commissioner
Docket No. 24882.
United States Tax Court
1951 Tax Ct. Memo LEXIS 312; 10 T.C.M. (CCH) 187; T.C.M. (RIA) 51052; March 1, 1951
*312 Royalty payments. - Petitioner orally assigned interests in patents and inventions to others who thereafter participated proportionately in royalty payments. Held, royalty payments received by the oral assignees not includible in petitioner's gross income. Carl G. Dreymann, 11 T.C. 153, followed. John J. Kendrick, Esq., 7th Floor, Home Bank Bldg., Toledo, Ohio, G. Charles Scharfy, Esq., and Robert Kniffin, Esq., for the petitioner. Clarence E. Price, Esq., for the respondent. *313 TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined a deficiency in income and victory tax against petitioner for the year 1943 in the amount of $78,748.57. The petitioner claims overpayment in the amount of $7,525.22 or, in the alternative, the amount of $59,313.34 alleged to have been paid within three years before the timely filing of claims for refund for the year 1943. The year 1942 is also involved because of the provisions of the Current Tax Payment Act of 1943. The principal issue is whether respondent properly included in petitioner's gross income $72,532.70 for 1942 and $79,928.81 for 1943, representing royalties received by persons other than petitioner. In the alternative, if the principal issue is decide in favor of respondent, a subsidiary issue is whether a waiver executed by petitioner embraced the five-year period of limitation provided in section 275 (c). The alternative overpayment in the amount of $59,313.34 is asked in the event this Court disallows claimed royalty deductions in Differential Steel Car Company, Docket No. 23909. Our opinion in that proceeding, 16 T.C. (No. 52), promulgated February 23, 1951, held *314 that the claimed royalties were proper deductions of the taxpayer therein and accordingly the issue involved in this claimed overpayment becomes moot. At the hearing the parties agreed that the evidence adduced at the hearing of Differential Steel Car Company, Docket No. 23909, supra, should, where relevant, also be considered as evidence in this proceeding. Findings of Fact Petitioner is an individual residing in Findlay, Ohio. He is the president and majority stockholder of Differential Steel Car Company, an Ohio corporation, also located at Findlay. Petitioner filed his individual income tax returns for the years 1942 and 1943 in the tenth district of Ohio. Petitioner is an inventor who has been working on inventions and securing patents since 1914, and by 1943 there were many United States and foreign patents registered in his name. Most of the inventions pertained principally to haulage and dumping vehicles used in the coal and iron mining industries and by railroads, steel mills, quarries, and similar industries. In years prior to the taxable years here involved petitioner had, for valuable considerations, orally assigned interests in various patents issued in his *315 name to various persons. The persons entitled to receive royalties, pursuant to such assignments by petitioner of interests in patents issued in his name, and their respective percentage interests as of the beginning of the taxable years were as follows: Name
Per Cent
H. Fort Flowers (Petitioner)
42.5532
Leon Fraser (Margaret M. Fraser
Estate)
7.737
Shelly G. Hughes
3.8685
Sara Niles Flowers
42.5532
Hugh H. Houck
.9671
Daniel F. Flowers
1.1605
Fred F. Flowers
1.1605
Total
100
The persons named above other than petitioner acquired their interests in the patents in the following manner: Leon Fraser, an attorney, first acquired his interest in 1917, in consideration of his financial assistance to petitioner personally, and his aid in organizing various companies in which petitioner was interested, and giving petitioner advice with respect to his business operations. His percentage interest commenced at eight per cent, but was adjusted over the years as additional individuals were assigned interests in and to the patents. In 1937 Fraser assigned his interest to his wife, Margaret M. Fraser, and such interest at the beginning of 1943 amounted to 7.737 *316 per cent. Shelly G. Hughes, a civil engineer, commenced in 1915 to give assistance to petitioner, aiding him by making drawings of cars which petitioner was manufacturing under his patents, and giving petitioner assistance in the development of his inventions. In consideration of such services and of future services, petitioner assigned a four per cent interest in the patents to Hughes in 1920, and such interest continued down to the beginning of 1943, but adjusted by that time to 3.8685 per cent. H. T. Thompson, an electrical engineer, first met petitioner in 1919. At that time petitioner required assistance in the electrical engineering field and Thompson aided him in his work on the controls and details of the electrical apparatus used on electric dump cars. In consideration of such services, and of future services, petitioner, Leon Fraser, and Shelly Hughes in January of 1922 assigned to Thompson a 2.344 per cent interest in the patents, and such interest continued down to the time of his death on August 19, 1942, but adjusted by that time to 2.321 per cent. C. E. Niles, petitioner's father-in-law, was a banker who resided in Toledo and Findlay, Ohio. With his aid and assistance *317 petitioner and the other individuals mentioned above moved their operations from New York to Ohio. Petitioner required financial assistance when he came to Ohio, and Niles and petitioner verbally agreed that in consideration of Niles' aid petitioner would assign to him one-half of his interest in the patents (petitioner's interest then being 85.938 per cent), and also permit him to acquire a stock interest equal to petitioner's in the Ohio corporation which was about to be formed for the purpose of manufacturing and selling the patented products. Niles performed his end of the agreement by providing office space in a Findlay building, arranging banking credit, and giving considerable assistance in negotiating the purchase of a factory. He also aided in the subsequent sale of such factory, and was of assistance to petitioner in acquiring a site for a new factory. He was almost entirely responsible for the financing of the construction of the new factory and the furnishing of working capital for the business and also helped to incorporate the Ohio company and was one of its first directors. In partial satisfaction and liquidation of his obligation to Niles (by reason of Niles' *318 having furnished the assistance which had been agreed upon), petitioner on January 3, 1922, assigned one-half (or 42.969 per cent) of his patent interest, but at the request of Niles, such assignment was made to Sara N. Flowers, Niles' daughter. Subsequently, in January of 1923, Sara N. Flowers purchased from The Differential Steel Car Company 164 shares of its capital stock and in addition petitioner gave 56 shares to her, so that her shares equaled his, each having 220 in number. Sara N. Flowers' interest in the patents has continued down to the beginning of 1943, but adjusted by that time to 42.5532 per cent. Hugh H. Houck, a mechanical engineer, rendered assistance to petitioner personally and to the other individuals owning patent interests by working on drawings concerning the inventions. In consideration of such services, and of future services, petitioner and the other individuals in 1924 assigned to him a 9671 per cent interest in the patents, and such interest has continued down to the beginning of 1943. All of the percentage interests above listed for Leon Fraser, Shelly G. Hughes, H. T. Thompson, Sara N. Flowers, and Hugh H. Houck were interests in the single patent *319 or patent application which was then in existence. Around 1926 or 1927 other inventions were being developed and it appeared that they would be of considerable value. The individuals other than petitioner desired to obtain interests in the patents which were to be issued on such new inventions, and on patents to be issued on future inventions which were being developed and which would be developed in the future; and so, at the request of such individuals and by mutual agreement, it was decided that the individuals other than petitioner would relinquish their outright interests in the then existing patent, in exchange for life interests (in the same percentage ratios) in such patent and in all patents to be issued in the future on inventions under development or consideration. Since Sara N. Flowers did not have the technical training possessed by the other individuals, and consequently could not be of assistance in the development of future inventions, she obtained her life interest in the existing and future patents by relinquishing her outright interest in and to the existing patent and by also relinquishing her rights to the shares of stock in a new Ohio corporation, the creation *320 of which was then being contemplated, her right to shares therein being surrendered to petitioner. Petitioner's twin sons, Daniel F. Flowers and Fred F. Flowers, are engineers. At the time of H. T. Thompson's death in August of 1942, they had just received their masters' degrees at Massachusetts Institute of Technology. Prior thereto, in 1941 and 1942, these sons had assisted petitioner in the development of improvements to inventions by running tests in the laboratory of Massachusetts Institute of Technology, by traveling through coal mines, and by making operating tests on "axless" truck cars, "axless" locomotives and other types of older equipment to determine the comparative operating results and advantages of the new improvements. Their work for petitioner was of great value to him. By agreement among those having interests in the patents, upon Thompson's death in 1942, his 2.321 per cent patent interest was transferred, one-half (1.1605 per cent) to Fred F. Flowers and one-half (1.1605 per cent) to Daniel F. Flowers, in consideration of the aid and assistance these sons had rendered in the development of improvements to the inventions and in consideration of aid and assistance *321 in the future. Thompson's shares of stock in Differential Steel Car Company (42 in number) were purchased by the company from his estate, at $200 per share, or $8,400. Thompson had originally acquired such shares for $100 per share, or $4,200. Royalties on the patented products heretofore mentioned were distributed among the persons holding interests in the patents, commencing in 1922, in accordance with their respective percentage interests. Thus, royalties were paid to petitioner, Sara N. Flowers, Leon Fraser, Shelly G. Hughes, and H. T. Thompson commencing in 1922; to Hugh H. Houck commencing in 1924; to Margaret N. Fraser commencing in 1937; and to Daniel F. Flowers and Fred F. Flowers commencing in 1942. Pursuant to agreements between the patentee and the company, royalties paid by Differential Steel Car Company and its predecessor were usually paid to the various individuals enumerated above, although on some occasions payments were made directly to petitioner who made redistribution thereof among the other individuals in accordance with their respective interests. Royalties paid by companies other than Differential Steel Car Company and its predecessor were paid to petitioner *322 who redistributed them among those having interests in the patents in accordance with their individual percentage interests. Sara N. Flowers placed her royalty receipts in her own individual bank account upon which petitioner had no right to draw. In 1943 petitioner presented to agents of the respondent a document prepared at their request concerning the division of royalty income received from the use of the patents of which petitioner was the record title holder. This document reads as follows: "March 17, 1943. "MEMORANDUM OF AGREEMENT "WHEREAS, on or about July 19, 1917, H. Fort Flowers assigned to Leon Fraser the right to receive 8% of all net royalties that might be earned by his inventions of Dump Cars, Trucks and other Vehicles, and "WHEREAS, on or about January 1, 1920, H. Fort Flowers assigned to Shelly G. Hughes the right to receive 4% of all net royalties that might be earned by his inventions of Dump Cars, Trucks and other Vehicles, and "WHEREAS, on or about January 1, 1922, H. Fort Flowers, Leon Fraser and Shelly G. Hughes agreed to share their portions with any other person or persons who might later be deemed sufficiently helpful and acceptable to said *323 parties and to re-distribute the pro rata portions of rights hereunder for the purpose of further developing these or other inventions, and "WHEREAS, it was agreed that this right to receive said royalties would exist only for the natural life of each respective assignee, and each assignee could, with the consent of H. Fort Flowers, Leon Fraser and Shelly G. Hughes, re-assign his life interest in said rights or any portion thereof, and "WHEREAS, it was further agreed that, upon the death of any one of the assignees, the rights that had been assigned to or re-assigned by the deceased would then revert back to those from whom said deceased had received said rights according to their pro rata rights, and "WHEREAS, on or about January 3, 1922, Harry T. Thompson was assigned the right to receive 2.344% of all net royalties that might be earned by said inventions of Dump Cars, Trucks and other Vehicles, H. Fort Flowers, Leon Fraser and Shelly G. Hughes contributing a proportionate share of their rights, and "WHEREAS, on or about January 2, 1923, H. Fort Flowers assigned to Sara N. Flowers the right to receive 42.969% of all net royalties that might be earned by his inventions of *324 Dump Cars, Trucks and other Vehicles, and "WHEREAS, on or about October 21, 1924, Hugh H. Houck was assigned 9671% of all net royalties that might be earned by said inventions of Dump Cars, Trucks and other Vehicles, H. Fort Flowers, Leon Fraser, Shelly G. Hughes, Sara N. Flowers and Harry T. Thompson each contributing a proportionate share of their rights, and "WHEREAS, the above percentages resulted in the right for each respective one to receive a certain percentage of these royalties as follows: H. Fort Flowers
42.5532
Leon Fraser
7.737
Shelly G. Hughes
3.8685
Sara N. Flowers
42,5532
Harry T. Thompson
2.321
Hugh H. Houck
.9671
100.000
"WHEREAS, on or about December 31, 1937, Leon Fraser re-assigned to Margaret M. Fraser the right to receive 7.737% of all net royalties that might otherwise be payable to him thereafter, and "WHEREAS, it now seems advisable to set down in writing the essence of the long standing agreements and working arrangements between the parties hereto, and "WHEREAS, on the 19th day of August, 1942, Harry T. Thompson died, and "WHEREAS, on or about the 21st day of August, 1942, it was mutually agreed by H. Fort Flowers, *325 Leon Fraser and Shelly G. Hughes, from whom Harry T. Thompson had received his rights and to whom said rights reverted upon his death, that the 2.321 percentage rights be divided equally between Daniel F. Flowers and Fred F. Flowers for and in consideration of the work they had done on improvements of said inventions, "NOW, THEREFORE, It is hereby confirmed and all interested parties agree that Daniel F. Flowers was entitled to and did receive 1.1605 percentage and Fred F. Flowers was entitled to and did receive 1.1605 percentage of all royalties due and payable after August 19, 1942, and that the purpose of this instrument is to confirm that understanding between the parties hereto. "IN WITNESS WHEREOF, the Parties hereto have executed this agreement in quintuplicate as of March 17, 1943. /s/ H. Fort Flowers /s/ Leon Fraser /s/ Shelly G. Hughes /s/ Sara N. Flowers /s/ Hugh H. Houck" The date on which Sara N. Flowers received her interest was January 3, 1922 and not January 2, 1923 as shown in the above document. In 1943 petitioner received $59,206.64 in royalties, but in his income and victory tax return for such year he inadvertently and erroneously reported receipt *326 of such royalties in the amount of $69,205.64, thereby overstating such royalties by $9,999. Under date of December 4, 1946, as the result of an audit of petitioner's 1943 income and victory tax return, respondent (by so-called 30-day letter) made a determination that petitioner was entitled to an overassessment of such taxes in the amount of $7,525.22. Petitioner filed a claim for refund of 1943 taxes in the amount of $7,525.22, on or about February 1, 1947. On February 11, 1947, and again on October 1, 1948, respondent requested petitioner to execute Treasury Department Form 872, "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax." On October 16, 1948, petitioner signed Form 872, wherein it was provided in part that "* * * the amount of any income, * * * taxes due under any return * * * for the taxable year ended December 31, 1943, * * * may be assessed at any time on or before June 30, 1949, * * *". Such form, signed by petitioner, was forwarded to the internal revenue agent in charge at Cleveland, Ohio, on October 16, 1948, together with a cover letter which read as follows: "Following my letter to you of October 8th, 1948, reference is made *327 to a letter from your office dated October 1st, 1948, requesting the execution by me of Form 872 extending the statutory period of limitation for assessment for the year 1943 until June 30, 1949. "When my records were examined with respect to my federal income tax liability for the year 1943, your office determined that I was entitled to a refund of $7,525.22. I refer you to your letter dated December 4, 1946. That determination and that overassessment are proposed within the statutory period of limitation as fixed by section 275 (a) I.R.C. Under date of August 3, 1948, you proposed to assess additional taxes in the amount of $78,748.57 for the year 1943, and contend that said assessment is not barred under the provisions of Section 275 (c) I.R.C. I have filed a protest to that determination. "Without in anywise waiving any of the protective provisions of Section 276 (b) I.R.C., and not in anyway admitting that the provisions of Section 275 (c) I.R.C. are applicable as contended by you, I have executed and am enclosing the Form 872 recently forwarded to me by you upon those understandings. *328 " The notice of deficiency involved herein was addressed and mailed to petitioner on June 17, 1949. Opinion Respondent would tax to petitioner the entire amount of royalty payments made in the taxable years by licensees of certain patents standing in petitioner's name, despite the fact that substantial portions of the payments were received by others. To do so, respondent treats the transactions pursuant to which the royalties were divided and paid as mere assignments of future income, ineffectual to relieve petitioner of taxability on the full amount. Respondent relies on Bing v. Bowers, 22 Fed. (2d) 450; affirmed 26 Fed. (2d) 1017; Ward v. Commissioner, 58 Fed. (2d) 757; George James Nicholson, 3 T.C. 596; and John Randolph Hopkins, 15 T.C. 160. These cases would sustain respondent's action if he has correctly analyzed the transactions in this case. Our conclusion after a careful study of the record is that more is involved here than an assignment of royalties or future income. Rather, what we have is an assignment of interests in the patents and inventions themselves, for valuable considerations, to several *329 persons, with a consequent division of royalty payments among them based in each case on the proportionate interest owned. So analyzed, the case is controlled by Carl G. Dreymann, 11 T.C. 153. One of the issues there was the effect of an oral agreement by a father to assign to his daughter, who had been assisting him, an undivided half interest in a process, when and if it was found, and one-half of what was realized from such interest. It was held that the daughter acquired an equitable half interest in the process which was later patented by the father and that only one-half of the "royalty" income was taxable to the father since the other half stemmed from a property interest owned by the daughter. We hold here that petitioner made valid oral assignments of interests in his patents and inventions to others and that he should be taxed only on so much of the royalty payments as he received and held as his own, i.e., 42.5532 per cent of the payments. Much of petitioner's trouble stems from the easy informality with which he and his associates dealt with each other in their early business ventures. Little was reduced to writing, but the obvious sincerity of the petitioner *330 on the witness stand and his uncontroverted testimony that he intended to and actually did make oral assignments of interests in his patents and inventions as outlined in our findings of fact convince us that that is what was done, and we have so found. In later years when the March 17, 1943 "Memorandum of Agreement" set forth in our findings was drawn, it dealt only with rights to receive net royalties. This is seized upon by respondent as establishing that the sum and substance of all the transactions was the assignment of "royalties" and not patent interests. We do not agree. Passing over the very real possibility that the writer was made simply to demonstrate to respondent's agents where the payments had eventually gone, on the record we see nothing inconsistent in reducing the royalty sharing to writing in a memorandum but in not doing so with the oral assignments of the patent interests. Here the parallel with Carl G. Dreymann, supra, is again apparent. In that case the agreement to assign the patent interest was oral, but the patents themselves stood in the father's (petitioner's) name and it was the father who executed the written royalty agreement pursuant to *331 which half of the royalties were to be paid to the oral assignee and half to petitioner. This arrangement was held not to negative the fact that the daughter (assignee) had a half interest in the patents and that the father should only be taxable on his share of the royalties. In this case we think the same situation exists so far as the holders of the parol assignments of the patents and inventions are concerned. As one court has said: "An assignment of patent need not be in writing at all, as between the parties; * * *," Westinghouse E. & Mfg. Co. v. Formica Insulation Co., 288 Fed. 330, 333. Though made by word of mouth the assignments were nonethless effective to pass property interests. Since the royalty payments stem from the patent interests it follows that petitioner should only be taxable for his proportionate share of the royalties. Respondent also attempts to bring this case within the realm of intrafamily assignments and transfers, pointing out that petitioner's wife and two sons are among those interested, the wife very substantially, and that the bulk of the royalty payments was made by the corporation of which petitioner was the major stockholder. But, *332 as we have found, the interest of the wife, Sara N. Flowers, had its inception in 1922 in satisfaction of an agreement made for valuable consideration between her father and petitioner. It was a good faith business agreement and we are unable to find anything sham or unsubstantial about it which would require us to disregard it for tax purposes. The sons' interests are small, but they were also received for valuable consideration and are nevertheless real. All three, the wife and the sons, hold property interests in the patents and we see no reason for taxing to the petitioner the royalty payments they received. On the significance of the petitioner's majority stock ownership in the corporation which was the source of most of the royalty payments we find none of the elements of control over the payments or the license contracts which were present in Commissioner v. Sunnen, 333 U.S. 591. The elements which the Court considered important there are lacking here and we note respondent does not cite the Sunnen case. Our holding for petitioner on the first issue makes unnecessary any consideration of the issue with reference to the statute of limitations. Decision will *333 be entered under Rule 50.