Grace Johnson **FLANDERS**, Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. No. 34571.

United States District Court
N. D. California, S. D.

April 20, 1959.

Paul S. Jordan, Stanley Walsh, Lamson, Jordan & Walsh, San Francisco, Cal., for plaintiff.

Robert H. Schnacke, U. S. Atty., Lynn J. Gillard, Chief Asst. U. S. Atty., San Francisco, Cal., for defendant.

JAMESON, District Judge.

Plaintiff seeks a refund of personal income taxes for the years 1951, 1952, and 1953, on the ground that income received by plaintiff as royalties from certain inventions and patents, taxed as ordinary income, constituted proceeds from the sale of capital assets and should be treated as long-term capital gains.

Plaintiff is the widow of Paul Flanders, who died on September 21, 1944. During his lifetime Flanders was associated with Carl W. Cherry in the development and promotion of inventions relating to rivets, rivet assemblies, and devices for applying the rivets. The nature of the relationship is in dispute and will be discussed later herein.

On June 21, 1937, Cherry filed an application for a patent on his "rivet". On December 19, 1939, patent (No. 2,183,-543) therefor was issued to Cherry. Subsequently patents were issued to Cherry covering various improvements on the rivet and on the machine or "gun" used to apply the rivet. Flanders was not at any time a record owner of any of these patents on the records of the United States Patent Office.

Flanders and Cherry had known each other for many years. Beginning in 1936 or 1937, Flanders assisted in the promotion of Cherry's invention. Both Cherry and Flanders are now deceased, so that their relationship must be determined from the testimony of others. It is perhaps best described by Jeanne Cherry, Carl's widow, who testified that Cherry told her Flanders was going to help promote the invention with him; that "Carl was the inventor and Paul was the one who was helping him to get his inventions out;" and that she "should think it was a joint operation." Plaintiff testified that Flanders took care of the business end of the deal and marketing end of the rivets while Cherry took care of the technical end of the work.

Cherry Rivet Company, a California corporation, was organized early in 1940. By written agreement dated March 8, 1940, Cherry and Flanders, as licensors, granted to Cherry Rivet Company, as licensee, full and exclusive rights to manufacture and sell, in the United States, rivets made from non-ferrous materials, and guns to apply them; to manufacture and sell, in the United States, guns and rivets made of any material to be used in the aircraft industry; to sell, but not to manufacture, anywhere in the world, guns and rivets of any material; and to authorize purchasers of the rivets to practice any of the patented processes. The agreement

did not specifically authorize the licensees to "use" the rivets.[1]

As of March 8, 1940, (although the agreement was not executed until August 16, 1940) Cherry and Flanders also entered into a written agreement which provides that Cherry "assigns and agrees to pay" Flanders "(25%) of the net receipts of Cherry for all moneys, property or other rights which may be received by Cherry from or on account of said inventions, patents and contracts, including all rights in, to, or under all future inventions which Cherry may invent relating to or adapted for use with rivets, and from all contracts which may be entered into relating to the same, and agrees to pay such * * * (25%) to said Flanders currently when and·if received."[2]

1. The primary license agreement (Ex. 1–B), dated March 8, 1940, and executed May 14, 1940, was substituted for a prior agreement and amendment, both dated March 8, 1940. Pertinent provisions upon which the respective parties rely include:

"Whereas, said Licensors are the sole owners of United States Letters Patent No. 2,183,543 for new and useful improvements in rivets, * * * (the respective interests of Licensors being shown in a separate agreement between said Licensors), and

"Whereas, said Licensee desires to acquire certain license rights from Licensors * * *.

" * * * said Licensors do hereby give and grant to said Licensee * * *;

"(1) The full and exclusive right and license for, in and throughout the United States of America, to manufacture and sell rivets and rivet assemblies which are made of non-ferrous materials, and rivets and rivet assemblies for use in the aviation industry regardless of the material from which they are made, under said Letters Patent 2,183,543 and under * * extension and re-issues thereof, and to authorize the purchasers of said rivets and rivet assemblies to use and practice the process set forth and claimed in said Letters Patent.

"(2) The full and exclusive right to manufacture, lease, or sell any and all other inventions or developments * * which * * * pertain to or are connected with rivets, rivet assemblies or the method of manufacturing or applying the same, * * *.

"(3) The full and exclusive right and license to manufacture, lease or sell said machines or guns for the application of said rivets * * *

"(4) The full and exclusive right and license to manufacture and use machines for the manufacture of said rivets, rivet assemblies or guns.

"(5) The full and exclusive right to authorize purchasers of said rivets and rivet assemblies to practice any process set forth and claimed in said Letters Patent No. 2,183,543 * * *

"(6) The full and exclusive right to sell (but not to manufacture) anywhere in the world, rivets and rivet assemblies * * * made in accordance with or under the above mentioned patent, * * * and

"(7) To sell or lease (but not to manufacture) anywhere in the world apparatus or guns for applying rivets of the kind or description covered by this License Agreement; * * *"

Counsel for plaintiff call attention to the use of the word "Licensors" throughout the agreement, and particularly to paragraph 18 providing that, "Licensee agrees to pay Licensors, jointly, royalties due hereunder; * * *"

2. Additional provisions of this agreement (Ex. 1–A) include:

"(2) By 'net proceeds' is meant the amount remaining from such receipts after deducting all necessary and proper expenses incurred by Cherry in and about developing and/or patenting and/or promoting such inventions.

"(3) Any disposition by Cherry of any of his rights relating to such inventions shall be subject to the payment to Flanders of twenty-five per cent. (25%) of the net proceeds any time received by the transferee of such rights, provided, however, if any such transfer is made for a valuable consideration twenty-five per cent. (25%) of which is paid to Flanders, then such transfer shall be free of all obligation on the part of transferee to make any payment to Flanders.

"(4) Cherry and Flanders shall share respectively in proportion of seventy-five per cent. (75%) and twenty-five per cent. (25%) the option to purchase stock in Cherry Rivet Company, set forth in a certain agreement between the parties hereto and Roland T. Kinney and Wendell H. Kinney dated the 6th day of February, 1940.

"(5) The·denoting of Cherry and Flanders as 'sole owners' in any other agree-

In addition to the refund claims for 1951, 1952 and 1953 in issue here, plaintiff had also filed claims for 1948, 1949 and 1950 which were based upon the same facts. The earlier claims were allowed by the Commissioner of Internal Revenue, upon the authority of Myers v. Commissioner, 1946, 6 T.C. 258. However, by reason of the withdrawal of the Commissioner's acquiescence in the Myers' decision, and substitution of a non-acquiescence for all taxable years commencing after May 31, 1950, the claims for 1951, 1952 and 1953 were disallowed.

Plaintiff argues that a prior favorable ruling on the 1948, 1949, and 1950 refund claims must be presumed to be correct and should apply with equal force to the 1951, 1952, and 1953 claims. It is well settled, however, that the Commissioner may promulgate a change in regulations to conform to the Revenue Act, to operate prospectively, and is not precluded by a contrary antecedent administrative interpretation, though of long standing. American Chicle Co. v. United States, 1942, 316 U.S. 450, 62 S.Ct. 1144, 86 L.Ed. 1591. See also Tonningsen v. Commissioner of Internal Revenue, 9 Cir., 1932, 61 F.2d 199, and cases there cited. The court must determine whether the tax was properly assessed for the years in question, regardless of the action of the Commissioner with respect to prior years.

Two primary questions are presented:

1. Did Flanders have a 25% equitable interest in the Cherry rivet inventions and patents issued therefor, acquired prior to "actual reduction to practice"?

2. Did the agreement dated March 8, 1940 between Cherry and Flanders as licensors, and Cherry Rivet Company, as licensee (and subsequent amendments thereto), constitute an assignment of the patents amounting to a sale of capital assets, or was this agreement a mere license under which substantial rights were reserved to the licensors?

Did Flanders acquire an equitable interest in the inventions and patents?

Plaintiff contends that Flanders, pursuant to an oral or implied agreement, entered into a joint venture with Cherry in the development and promotion of Cherry's inventions which entitled Flanders to an equitable interest therein, and that the written agreement between Cherry and Flanders dated March 8, 1940, was a reduction to writing of their prior agreement or understanding. There is no contention that Flanders was the owner of any legal title.

Defendant contends that the agreement dated March 8, 1940, reduced to writing the entire oral understanding between the parties and is controlling and unambiguous; and that under this agreement Flanders did not acquire any interest in the inventions or patents, but merely the right to receive from Cherry 25% of the net proceeds.

Defendant argues that plaintiff is precluded from urging a joint venture by reason of plaintiff's statement in the pre-trial order that the written agreement between Cherry and Flanders was "for the purpose of reducing their prior oral understanding and agreement to writing." It is true, as defendant contends, that plaintiff is bound by her statement of facts and issues contained in the pre-trial order.[3] I do not find any inconsistency, however, between the contention therein recited and the con-

---

ment shall not in any way enlarge the rights of Flanders beyond the terms of this agreement.

"(6) Flanders covenants and agrees, in consideration of the payments to be made to him, as hereinabove provided, to continue to make all reasonable efforts to promote said Cherry inventions as the same may be necessary or proper from time to time, should said Cherry Rivet Company license rights thereunder be terminated or surrendered at any time."

3. Rule 16, F.R.Civ.Proc., 28 U.S.C.A.; Fowler v. Crown-Zellerbach Corp., 9 Cir., 1947, 163 F.2d 773; Ringling Bros.-Barnum & Bailey Combined Shows v. Olvera, 9 Cir., 1941, 119 F.2d 584.

tentions advanced at the trial and in plaintiff's briefs.[4]

▮ Nor can I agree with defendant's contention that extrinsic evidence is not admissible in determining whether Flanders had an interest in the inventions and patents. First, it must be determined whether Flanders acquired an interest in the patents and inventions prior to their actual reduction to practice. This question is not answered by the written agreements, which, as set forth later herein, were executed subsequent to the reduction to practice. Second, the parol evidence rule does not apply between a party to a contract (or his successor in interest) and a stranger.[5] Third, the relationship of the parties cannot be determined solely from the written agreement dated March 8, 1940. It must be construed with six agreements or amendments,[6] which they executed with Cherry Rivet Company between March 8, 1940 and March 16, 1944, in which Cherry and Flanders were named as "licensors" and "owners". In my opinion, the contracts themselves do not show clearly whether Flanders had an equitable interest in the inventions, and resort must be had to extrinsic evidence to resolve the uncertainties and ambiguities arising therefrom.[7]

George B. White, a patent attorney, represented Cherry in the proceedings before the patent office and in the drafting of the Cherry-Flanders agreement. He was consulted from time to time by both parties and also represented both on the Board of Directors of Cherry Rivet Company in 1944, billing Cherry for 75% of his fee and Flanders for 25%, and continuing this practice with plaintiff after Flanders' death.

White's first record of any contract with Flanders was on January 24, 1938, with reference to Flanders' correspondence with a firm in Scotland concerning rivets.[8] Correspondence between White and the Cherrys in February and March, 1938, refers to Flanders in connection with the Scotland contact. A letter from the Cherrys to White, dated April 4, 1938, tells of a man from Chicago whom "Paul wants to fill * * * up with the rivet." A letter from the Cherrys to White dated January 27, 1939, reads in part: "Okay * * *

4. Other provisions of the pre-trial order include: "Plaintiff contends the following issues are present in this case: * * Issue 2: Were Paul Flanders * * * and Carl W. Cherry joint venturers with respect to the development and disposition to their mutual advantage of said Cherry Rivet inventions and patents". (p. 3) "Plaintiff's Contentions * * * 3. Paul Flanders * * * and Carl W. Cherry were joint adventurers with respect to the development and disposition, to their mutual profit and advantage, of said rivet inventions and patents. Cherry had a seventy-five percent interest in said joint adventure and Flanders had a twenty-five percent interest therein. These inventions and patents constituted the assets of the joint adventure and the purpose and objective of the venture was for a profitable disposition of the same. Cherry, although the record owner of said patents in the United States Patent Office, nevertheless held the same in trust for the benefit of the joint adventure and of the joint adventurers in proportion to their respective interests therein * * *" (p. 6).

5. Cal.Code of Civ.Proc. § 1856; Broder v. Epstein, 1950, 101 Cal.App.2d 197 at page 199, 225 P.2d 10, 11.

6. Flanders joined as licensor and owner in the primary agreement (Ex. 1–B) described in Note 1, in two other agreements with Cherry Rivet Company, dated March 8, 1940, (Ex. 1–C and 1–D) and in agreements dated respectively July 1, 1940 (Ex. 1–E), January 14, 1943 (Ex. 1–F), and March 16, 1944 (Ex. 1–G). Cherry and Flanders were also designated as "licensors" and "owners" in an option agreement (Ex. 3) with Wendell H. Kinney and Roland T. Kinney, dated February 6, 1940.

7. Cal.Civ.Code, § 1647, Cal.Code of Civ. Proc. § 1860, 12 Cal.Jur.2d 339, 340, Contracts, § 126.

8. Ex. 13 contains correspondence in December, 1937, between Flanders and Bruntons, (Musselburgh) Ltd., Wire Mills, Musselburgh, Scotland, relating to rivets.

full speed ahead * * * at your own pace. Carl is delighted with the news * * * also our Mr. Flanders * * *." A letter to White, dated August 7, 1939, signed "Carl and Jan", probably typed by Mrs. Cherry, concerning a visit to Douglas and Bendix, stated that a "head of a machine engineering laboratory" asked to see the patent claims and, "We didn't have them and Paul is rather against showing them until he has made some offer. Leon Harvey wanted them for *his* patent lawyer to look over. Paul said to us that we're not moving either in anything until we have consulted our patent lawyer. He also told me to tell you he wasn't keen on letting them have the claims but if you approve it would be O: K: with him * * *." On the second page, the following appears: "Since I wrote Paul has suggested that he have an assignment to be put into the patent records in Washington. Carl is against the idea and thinks Paul's interest could be guarded just as well by a contract * * * but as you are I hope our arbiter and defender in all matters that may come up about the rivet we want to know what you think and how best to tackle the problem. Up to now as you know there has been a gentleman's agreement on this matter, but since Paul has himself taken a step out of that then it seems to us we had better get on a business basis right from the start."

Flanders wrote two checks in favor of White for $20 each, dated October 23, 1939, and November 2, 1939, respectively, which were in payment for file wrappers, history, and photostatic copies of

certain patents which White obtained at that time.

With reference to the Cherry-Flanders agreement dated March 8, 1940, White testified that a document prepared by counsel for Flanders was submitted to Cherry reciting an assignment of a 35% interest to Flanders. Cherry told White that the agreement with Flanders was for 25%. Cherry then instructed White "to draw up something, some contract, where Paul is protected and at the same time nothing will be recorded in the patent office", and White "drew up the agreement in substance as it was when they signed subsequently."[9]

Concerning the parenthetical clause in the license agreements, White testified that a similar clause had been inserted in the original option agreement (Ex. 3) after he called "attention to Carl Cherry in the presence of the others that a recital of ownership between the parties would ultimately indicate that they were fifty-fifty half owners of the patent."[10] It is clear from White's testimony that Cherry did not want Flanders to be a record owner in the patent office, but that he wanted some agreement which would "protect" Flanders, depending upon White to draft whatever might be necessary to accomplish this result.

Between August, 1939 and August, 1940, Flanders communicated with Wendell H. Kinney, President of Kinney Iron Works and later president of Cherry Rivet Company, relative to manufacture of the rivets. Kinney testified that his first contact with the "entire situation" was a letter from Flanders dated August 31, 1939, telling about the rivets; that

9. Testifying further regarding this agreement White said that Cherry "didn't give me instructions as to whether it should be profits or interest or title. The only instruction to me was that Paul be protected but his name should not go on record in the patent office; that's all."

10. White testified further: "That's the usual ruling on joint ownership of patents, and I told him I didn't know what the agreement is, if any, with Flanders 'but now is the time to make up your

mind.' I don't know the exact words of what went on, but the essence of it was that Mr. Cherry, who was very jealous all the time of having all patents in his own name, objected right away, telling me that it was not a 50-50 arrangement." White then suggested inserting the provision stating: "We can insert this, that the interests of the parties are covered by a separate agreement, and that will at least cover the situation for the time being. And whatever you do after is all right."

at his first meeting with Cherry and Flanders in October, 1939, Flanders said, in Cherry's presence, "We're in it (the Cherry rivet) together"; that he was told by either Flanders or Cherry that he "would deal with Flanders relative to the business side of the rivets as opposed to the mechanical side of the rivets." Flanders corresponded with Kinney between September 14, 1939 and March 15, 1940, concerning rival patents and the prospective agreement. A letter dated January 7, 1940, from Flanders to Kinney reads in part: "We * * * are gambling better than three years' time and many thousands of dollars, which has already been expended against your success." A memorandum written about January 18, 1940 summarizing the understanding between Flanders and Cherry and the Kinneys contains: "(2) Contract to be between Paul and Carl on one hand and the new Corporation with Roland and Wendell (Kinney) acting as agents." [11]

William B. Hubbard, one of the organizers of Cherry Rivet Company and its second president, testified that his discussions of the "business end" of the Cherry Rivets were all with Flanders, and that his discussions with Cherry related to the "mechanical aspects of the development of the rivet."

Flanders arranged for tests of the rivets at Stanford University, which were made under the direction of Professor Harry A. Williams. The correspondence regarding these tests, which extended from August 14, 1937 to August, 1938, was between Flanders and Williams, and the reports of the tests were sent to Flanders. Flanders paid for these tests with his personal checks.

Other evidence of Flanders' activities include the following: Flanders paid for the final fee on the first of the Cherry patents with a check dated August 7, 1939. A resolution of the Cherry Rivet Company, dated March 19, 1940, gave certain named persons an option to purchase stock, including "Carl W. Cherry and Paul Flanders (jointly)". Flanders was one of the original members of the Board of Directors of the Cherry Rivet Company, although he never owned as much as 5% of the outstanding stock of the company.

On October 1, 1944, subsequent to Flanders' death, an agreement (Ex. 1–H) was executed by Carl W. Cherry as licensor and Cherry Rivet Company as licensee, which contained the following recital:

"Whereas, Cherry represents that as provided in a certain Agreement dated March 8, 1940, made between Carl W. Cherry and Paul Flanders (a copy of which is hereto attached as Exhibit A) the sole right, title and interest of Paul Flanders under or with respect to said patents and inventions and the Domestic License Agreement as Amended was the right to receive from Carl W. Cherry (for acting as Cherry's personal representative) twenty-five per cent (25%) of the net receipts of all moneys, property or other rights which may be received by Cherry from or on account of said inventions and patents, all as more particularly provided in said agreement; and

"Whereas, Paul Flanders died in September, 1944, and said personal representation has necessarily ceased; * * *."

---

11. Kinney testified further that although he was told that the patent would always have to be in Cherry's name, he had been told that Cherry and Flanders "were in it together" and he presumed that "it was the ownership and the promotion of the patent." (Dep. 84.) "I would say that from my first contact with Cherry and Flanders I was led to believe by Cherry and Flanders that Flanders always had an interest in the patent. I never knew—put it this way. I never inquired as to the nature of the interest or in whose name the patent stood. I was dealing with both of them together and never anticipated any problem along those lines, so at the beginning of my negotiations, I didn't make any direct inquiry as to the name of the individual in which the patent reposed." (Dep. 85.)

Plaintiff, as executrix and as residuary devisee and legatee under the will of Paul Flanders, executed an addendum, dated December 23, 1944, approving the agreement and recognizing and admitting "the correctness of the representation therein made by Carl W. Cherry as licensor with respect to the ownership of said patents and inventions and the rights of Paul Flanders and the undersigned."

Did plaintiff's execution of the addendum to the agreement of October 1, 1944 constitute an admission that Cherry was the sole owner of the patents and inventions and that Flanders had no equitable interest therein? This agreement had been under consideration for sometime prior to Flanders' death. On May 13, 1944, Cherry wrote White, "We are willing to settle our differences with the Company, thru the signing of a new agreement with it, *not* an amendment to the present agreement" on terms therein specified. Cherry signed the letter and an approval was signed by Flanders. Thereafter several partial drafts were prepared, but no agreement had been executed at the time of Flanders' death. White testified that the agreement in the final form was executed as a matter of expediency by reason of the company's desire to put the new lower royalty rate into effect. The attorney for the company was unwilling to accept Cherry's signature alone and prepared the consent executed by plaintiff.[12] White testified further: "There is no question in my mind that had Mr. Flanders been alive when the final draft was prepared, he wouldn't have stood for leaving his name out of the contract. He directed me in the negotiations with Carl Cherry—he was the surest trader of the three of us, and certainly the ultimate contract would have been drawn with his name in it."

Plaintiff testified that after Flanders' death, "They came to see me * * * and I said to Carl, not knowing much about it, I said, 'Perhaps I shoudn't have this twenty-five percent interest because Paul isn't here to help you any longer.' Those were my exact words. He said, 'I wouldn't have got to first base without Paul.' That was his exact words." After Flanders' death, the Cherry Rivet Company continued to pay directly to plaintiff 25% of the net proceeds and rendered statements to "Carl Cherry and Grace Flanders". Cherry reported as taxable income the 75% of the net proceeds which he received directly from Cherry Rivet Company, and plaintiff reported the 25% which she received.

In my opinion, plaintiff's statement in the addendum to the agreement of October 1, 1944, does not now preclude her from asserting that Flanders held an equitable interest in the inventions and patents. White's explanation "of expediency" is reasonable and, in any event, no admission of plaintiff would alter the situation if Flanders had in fact acquired an equitable interest during his lifetime.

█ The foregoing is a fair summary of the pertinent testimony on the relationship between Cherry and Flanders. Does it establish a joint venture between them? Both Cherry and Flanders were residents of Carmel, California, and all negotiations were conducted and contracts executed in California. California law accordingly applies in determining whether there was a joint venture.[13] The applicable California law is well

---

12. White explained further that Mrs. Flanders was not made a party to the agreement as a representative of her husband "because I pointed out to them that this agreement would have to be submitted to the estate and then the probate court would have been petitioned to approve the particular change in the agreement, but she had no authority, and for some reason they didn't want to have the delay, and I suggested this as the out." (Tr. 133.)

13. See Tate v. Knox, D.C.Minn.1955, 131 F.Supp. 514.

summarized in the following excerpts from California Jurisprudence:

> "A joint adventure is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." 28 Cal.Jur. 2d 475, § 2.[14]

> "To establish the existence of a joint adventure there must be proof * * * of a community of interest and a sharing of profits and losses. Moreover, each joint adventurer must have an equal right, or the right in some measure, to direct the conduct of the others through a fiduciary relation that must exist. And, generally speaking, a joint proprietary interest in the joint adventure property and joint participation in the conduct of the business are essential elements. This is not to say, however, that there cannot be a joint venture where the parties have unequal control of operations * * * Nor is it necessary that the property forming the capital of the adventure be jointly owned by the parties. Thus, where the evidence clearly shows the parties' intention to engage in a joint enterprise for profit, the principles governing joint venture apply irrespective of how title to property is taken. Furthermore, a substantial contribution can be made to a joint enterprise by furnishing of knowledge, skill, and services, as well as by money." 28 Cal.Jur.2d 478, § 3.

> "The relationship of joint adventurers is founded on contract. And whether the parties have created such a relationship as between themselves depends upon their actual intention, to be determined in accordance with the ordinary rules governing the interpretation of contracts." 28 Cal.Jur.2d 485, § 6.

> "The law requires little formality in the creation of a joint adventure, and an agreement therefor is not invalid because of indefiniteness in respect to its details. The relationship may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties." [15] 28 Cal.Jur.2d 485, § 6.

> "The nature of a title of a joint adventurer in joint adventure assets is that of beneficiary of a constructive trust * * *. It follows that a joint adventurer holding or acquiring title to property for a joint adventure is a trustee for his co-adventurers. This is so though he buys and pays for the property with his own funds." 28 Cal.Jur. 2d 494, § 12.[16]

Both parties cited Universal Sales Corporation v. California Press Mfg. Co., 1942, 20 Cal.2d 751, 128 P.2d 665, which involved a written contract for the sale of a feed pellet press, providing that in consideration for purchasing, demonstrating, and advertising the machine, the buyer should receive 20% of the gross proceeds of future sales and interest in any patents or improvements thereon. The court said:

> "This cooperation promotive of the common enterprise and involving the combination of the skill and efforts of both the plaintiff and the defendant suggests that the parties intended to establish a contractual relationship between themselves akin to that of joint adventurers. Further indication of this purpose is the royalty clause of the agreement referable to the plaintiff's

---

14. See also Annotation, 138 A.L.R. 968 (1942), "What amounts to joint adventure."

15. See Nelson v. Abraham, 1947, 29 Cal.2d 745, 177 P.2d 931; San Francisco Iron & Metal Co. v. American Milling & Industrial Co., 1931, 115 Cal.App. 238, 1

P.2d 1008; Annotation, 138 A.L.R. 968, 969 (1942).

16. See also California Home Extension Ass'n v. Hilborn, 1953, 115 Cal.App.2d 634, 252 P.2d 368, 370; 30 Am.Jur. 966, Joint Adventure, § 38.

share of the gross proceeds of sales of presses based upon the original model, whether such sales be negotiated by the plaintiff or the defendant, and the clause relating to the respective interests of the parties in any patent of the machine and 'any improvements thereon that may be thereafter made by either party.' While in a technical joint venture there is usually a sharing of profits and losses in the prosecution of the common enterprise * * * the mode of participating in the fruits of the undertaking may be left to the agreement of the parties * * * Whether the parties to a particular contract have thereby created, as between themselves, the strict relation of joint adventurers or some other relation involving cooperative effort, depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts * * * The acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary." 128 P.2d at pages 673, 674.[17]

▋ In my opinion plaintiff has established that Cherry and Flanders were engaged in a joint venture. Cherry was the inventor, conceiving the ideas and doing the actual mechanical work. Flanders was the promoter and businessman. While legal title to the inventions and patents at all times stood in Cherry's name, Flanders had an equitable interest therein, dating back to 1937 or 1938. This interest was clearly recognized in the correspondence and conversations with White, Kinney, and Hubbard in August, 1939, including Cherry's letter to White of August 7, 1939, referring to the "gentleman's agreement" which had theretofore existed between them. The subsequent written agreements did not change the relationship between the parties or deprive Flanders of his equitable interest in the inventions and patents.

▋ Assuming that there was a "sale" of the interests in the patent, plaintiff is entitled to capital gain treatment on the proceeds of the patents and inventions, if Flanders was a "holder" under 26 U.S.C.A. § 117(q), i. e. if he acquired his interest "in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent".[18]

17. In my opinion the California law cited herein is sufficient to show that a joint venture existed between Cherry and Flanders, and that Flanders had an equitable interest in the patents and inventions. The same rules for determining whether a joint venture existed have been followed in many tax cases. See, for example, Landreth v. United States, D.C.N.D.Tex.1946, 70 F.Supp. 991, affirmed 5 Cir., 164 F.2d 340; Straubel v. Commissioner of Internal Revenue, 1933, 29 B.T.A. 516; Dreymann v. Commissioner of Internal Revenue, 1948, 11 T.C. 153; H. Fort Flowers, 1951, 10 T.C.M. 187.

18. Section 117(q), Int.Rev.Code of 1939 (26 U.S.C.A. § 117(q) ) provides: "(q) Transfer of patent rights.—(1) General rule.—A transfer * * * of property consisting of all substantial rights to a patent * * * by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or (B) contingent on the productivity, use, or disposition of the property transferred. (2) 'Holder' defined.—For purposes of this subsection, the term 'holder' means —(A) any individual * * * who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—(i) the employer of such creator, nor (ii) related to such creator * * * (4) Applicability.— This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning

The parties agree that the test of when an invention is reduced to practice is "when it has been tested and operated successfully under operating conditions".[19] There is little, if any, dispute as to when the rivets and guns were reduced to actual practice. Without reviewing the evidence in detail, it may reasonably be inferred that the rivet was reduced to actual practice in the early fall of 1939, and not later than October 20, 1939, and that the gun was reduced to actual practice in late 1939, and not later than January 7, 1940. In any event, the joint venture (and Flanders' interest in the patents) commenced prior to the "actual reduction to practice" of the inventions.

Did the license agreement of March 8, 1940, as amended, constitute a "sale" or a "mere license"?

In order for an exclusive license agreement to constitute a sale of a patent, all substantial rights therein must be transferred to the licensee.[20] Defendant contends that the plaintiff has failed to establish a sale because (1) the right to "use" was not transferred; and (2) the full right to "make" rivets was not transferred.

More specifically, defendant argues that the omission of the word "use" in the granting clause of the license agreement (Ex. 1–B)[21], and its inclusion in other provisions of the agreement clearly shows that the restriction was deliberate. Plaintiff contends that the omission of the word "use" evidenced no withholding of "a substantial right" by licensors because they could neither manufacture nor sell rivets under the patent (those rights having expressly passed exclusively to the licensee) and they could therefore use the rivets only by buying them from licensee, like any other purchaser.

With reference to "making rivets", the license agreement granted the right to "manufacture and sell rivets and rivet assemblies which are made of non-ferrous material, and rivets and rivet assemblies for use in the aviation industry regardless of the material from which they are made". In the amendment to the license agreement, effective October 1, 1944, (Ex. 1–H), executed by Cherry, subsequent to Flanders' death, the right to make and sell rivets made of ferrous as well as non-ferrous material was granted to Cherry Rivet Company. In the years 1946 through 1950, the ferrous rivets accounted for from 4.5 to 10.2% of the total production.

Did the licensors retain "substantial rights" under the original license agreement in failing to include (1) the "use" of the rivets, and (2) the right to make ferrous rivets for sale to others than the aircraft industry? William Hubbard, who was a director of the Cherry Rivet Company at the time the original license agreement was executed and later its president, testified in his deposition: "It was not contemplated that Cherry Rivet Company would go into the manufacturing business where the Cherry Rivets would be used as a component part of something they were putting out, but the right existed, I think to do that if we wished to do it * * *". It was Hubbard's opinion that the right was not of "great substantial importance". He testified further: "I don't think the Cherry Rivet Company made an issue of the right to use at all, because in our minds it was an integral part of the setup, and to our minds we could do the whole business. They were concerned with the manufacture, sale and, by implication, use, and in some cases we refer to the use of it, in other cases we don't, but so far as I was concerned, as

---

after May 31, 1950, regardless of the taxable year in which such transfer occurred." (As amended Jan. 28, 1956, c. 18, § 1, 70 Stat. 8; June 29, 1956, c. 464, § 1, 70 Stat. 404.) Flanders was not either an employee or relative of Cherry.

19. See regulation of Commissioner of Internal Revenue relating to Sec. 1235 of 1954 Code (C.C.H.1958, Vol. 4, Par. 4744A).

20. See Note 18.

21. See Note 1.

president of the company, and so far as Carl Cherry was concerned in my discussions with him later, the Cherry Rivet Company had the right to do the whole works."

In a letter dated January 5, 1940, Wendell H. Kinney, in discussing the rights to be granted to the company to be formed to make rivets, said: "We would probably want to have all of the rights on the non-ferrous rivets in case you have any other plans for working something out on the iron and steel rivets." In reply, Flanders wrote Kinney on January 7, 1940, "We are perfectly willing to turn over all rights for the aviation industry on the Cherry rivets and guns * * * ".

White testified that there was no demand for ferrous rivets outside of the aircraft industry from 1941 to 1945, because of the priority allocations of materials during the war.

In support of its contention that there was no sale, defendant relies primarily upon Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923. Although this case was concerned with the question of whether an assignee of patent rights could sue for infringement, the court laid down a test which most of the • cases involving the question of whether there was a sale of a patent for tax purposes, have either followed or found it necessary to distinguish. The Waterman case held that the grant of "the sole and exclusive right and license to manufacture and sell" the patented article throughout the United States, which did not include the right to use such article, at least if manufactured by third persons, was a mere license and gave the licensee no right in his own name to sue a third person at law or in equity for infringement of the patent. In prescribing what rights must be conveyed to constitute an assignment or sale of a patent the court said:

"The patentee or his assigns may, by instrument in writing, assign, grant, and convey, either (1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of the United States. Rev.Stat. § 4898 [35 U.S.C.A. § 261]. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers. In the second case, jointly with the assignor. In the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." 138 U.S. at page 255, 11 S.Ct. at page 335, 34 L.Ed. at page 925.[22]

A determination of whether the license agreement here constitutes a sale or a mere license requires a careful analysis of the extent to which the Waterman rule has been followed and distinguished in tax cases. One of the first cases which recognized the distinction between an action for patent infringement and one involving income tax liability is Parke, Davis & Co. v. Commissioner, 1934, 31 B.T.A. 427, 431, where the court said:

"We are familiar with the decisions cited by respondent holding that purported assignments of patent rights which failed to grant the right to the assignee to sell the patent or license its use were in themselves only licenses (citing Waterman v. Mackenzie, supra; Six Wheel Corporation v. Sterling Motor Truck

22. See also United States v. Gen. Elec. Co. 1926, 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362; Six Wheel Corporation v. Sterling Motor Truck Co., 9 Cir. 1931, 50 F.2d 568.

Co., supra, and other cases). The question presented in these cases was the right of the so-called assignee to maintain a suit for infringement which right was denied because the right to sell the patents or license their use had been retained by the assignor.

"In none of the cited cases did the court have the situation here existing. The questions there presented were entirely different from the one before us for decision. The right to maintain a suit at law is often controlled by the question of the possession of the naked legal title. Here we have a question of income tax liability where legal title is of little consequence and the inquiry is as to the ownership of the beneficial interest."

In Allen v. Werner, 5 Cir., 1951, 190 F.2d 840, 842, the granting clause of an agreement specified that the licensee would have the exclusive right to manufacture and sell hydraulic lifting jacks in the United States and Canada, but did not expressly grant or reserve the right to "use" the articles. Another paragraph of the agreement, however, stated that the licensee planned "manufacture, use and sale in Canada", and the court held that the agreement was ambiguous and consequently subject to explanation by parol evidence. From the parol evidence the court concluded that the agreement evidenced a sale of all rights of the patentee.

Defendant relies on Broderick v. Neale, 10 Cir., 1953, 201 F.2d 621, 623, which held that a license agreement granting the right to manufacture and sell patented articles was not a sale for tax purposes on the grounds (1) that there was no transfer of an exclusive right to use the invention and (2) that the "rights of the licensees * * * continued at the will of the (licensor)" because (a) he retained the right to terminate the agreement upon one year's notice and (b) a subsequent contract was entered into changing the royalty provi-

sion. The instant case is similar in that the license agreements did not specifically grant the right to use the patented articles. In Broderick v. Neale, however, machines covered by the patents had been constructed by the licensor (Neale) prior to the license agreement, and "clearly Neale retained the right to use any of such machines, even though there was an implied right in the partnership to use the machines manufactured by it." 201 F.2d at page 624.

United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21, held that an agreement granting the exclusive right to manufacture, sell and use patented inventions, but which limited the license to the tuna industry, was a sale within the meaning of Section 117 of the Internal Revenue Code. "The testimony revealed that the patents had no established value for any purpose other than processing tuna fish, and that no attempt had ever been made to use the patents outside of the tuna industry." 219 F.2d at page 25. Concerning Waterman v. Mackenzie the court stated: "We are not convinced that it would be reasonable or necessary for this court, in the tax case now before us, to strictly and literally apply the test announced in an infringement suit in the nineteenth century." 219 F.2d at page 24. The court held, however, that in any event, the Waterman test was met.

The Senate Committee Report on the Internal Revenue Code of 1954, in discussing the purpose of section 1235 (applicable to taxable years beginning January 1, 1954) which, as far as here applicable, contains the same language as section 117(q) of the 1939 Code, supra, contained the following:

"* * * Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to 'use' the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right un-

der the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones. * * *" 3 U.S.Code Congressional & Administrative News, 1954, p. 5083.

The foregoing excerpt from the Senate Committee Report was quoted in Lawrence v. United States, 5 Cir., 1957, 242 F.2d 542, where an inventor of a device for removing pipe and other obstructions from oil wells granted the exclusive right to manufacture, use and lease, but not to sell the invention. The inventions were service tools which could be used only by trained operators and were withheld from sale to protect the reputation of the device. The court held that there was sufficient evidence to support a finding that all substantial rights in the patent were transferred, saying: "What is 'substantial' often becomes a factual question to be decided according to the facts and circumstances of each case and the peculiarities inherent in each patent." 242 F.2d at page 545.

Plaintiff relies strongly on Rollman v. Commissioner of Internal Revenue, 4 Cir., 1957, 244 F.2d 634, in which there was an agreement granting the full and exclusive right to manufacture and sell shoes under a patent, but which did not expressly grant the right to use the shoes. The court held that it was the intention of the parties to convey the full use of the patent and that all substantial rights had been transferred. Speaking of the right to use the shoes the court said: "No one in the pending case has ventured to suggest what use The Rollmans can make of the shoes manufactured under the patent other than to wear them; but this was a right to which every purchaser from Rikol was

entitled to enjoy; nor has any one been able to suggest what use the manufacturers could make of the footwear and of the patent rights other than to manufacture the shoes and sell them to the general public." 244 F.2d at page 639.

In Lockhart v. Commissioner, 3 Cir., 1958, 258 F.2d 343, an agreement granted the exclusive right to manufacture and sell Hyposeal, a hypodermic syringe disposable after one use, but did not mention the right to use it. In holding that the agreement was a sale within the meaning of section 117, the court said: "We do not think, however, that the omission of the term 'use' was fatal in this respect. The Waterman case involved the right of the licensee to sue an infringer. The rule of that case has not been strictly applied by the courts in federal tax cases. In such cases the courts look to the realities of the situation rather than to its form. If the grantor has evidenced an intention to surrender to the transferee substantially all his rights in the patent, imperfections in draftsmanship, or the failure to use particular words do not control, and it has been held that, for income tax purposes, the transaction has effected a sale. (Citing cases and Senate Report No. 1622, 83d Cong.2d Sess., supra.)" 258 F.2d at page 349.

In Hickman v. Commissioner, 1958, 29 T.C. 864, it was held that an instrument granting the exclusive right to manufacture paraffin scrapers to be used in oil wells, but not expressly granting the right to sell or to use the scrapers, resulted in a sale entitling the vendors to treat the proceeds as long-term capital gain. The court said: "The instrument providing for the transfer * * * expressly refers to 'the exclusive right to manufacture' the product. The terms of payment provided therein clearly show that the right to sell the product manufactured is necessarily implied under the circumstances of this case. While there is no reference in the instrument to use, it is clear from the surrounding circumstances that the factor use (beyond man-

ufacture and sale) was of no practical significance to either party. Moreover, the oral testimony * * * shows that it was intended that the entire undivided one-half interest of the estate in the patent application and any patent thereunder be conveyed * * * The estate had no practical reason to retain an interest in the patent. (Citing cases.) The actual and practical construction of the transfer to the interested parties supports the view that the intent was to convey the estate's entire interest in the patent application and any patent issued thereunder." 29 T.C. at page 874.

The most recent case is Bannister v. United States, 5 Cir., 1958, 262 F.2d 175, which involved an agreement transferring rights in patents on a device for taking cores and samples from oil wells without removing the pipe and bit from the hole. "In salient part, it provided as follows: (1) Bannister granted to Schlumberger an exclusive non-divisible and non-assignable license to Claims 10, 11, 12, 13, 14, 15 and 19, only, of the patent. (2) Schlumberger might not use the device (a) in association with a drilling bit, or (b) while the bit was in the hole, and (c) not in wells drilled in whole or in part by use of the Bannister rubber hose drilling system. (3) Bannister retained the right to use the device in connection with his rubber hose drilling system * * * (5) Bannister reserved the right on thirty days notice to cancel the exclusive feature of the license to Schlumberger * * *" (161 F.Supp. 298, at page 300.) The licensee desired the patents only to forestall any claim of patent infringement and did not intend to use the device because it considered its own to be superior. The court held that all substantial rights had been transferred. Concerning the Waterman case the court said: "For many years * * * the commissioner and the courts, in deciding the tax consequences of dealings with patents, held themselves to be strictly bound by the precise holding in Waterman v. Mackenzie * * * though the Waterman case dealt not at all with the taxation but with the infringement of patent rights and laid down a test for determining, for the purpose of the right to sue at law for infringement, whether there had been a license or an assignment thereof." 262 F.2d at page 177.

■ In my opinion Cherry and Flanders transferred all "substantial rights" within the meaning of section 117(q) of the Internal Revenue Code of 1939. It is true that the right of "use" was not specified in the granting clause, and the right to make rivets of ferrous material was limited to the aviation industry. But the courts have held uniformly that it is necessary to look to the substance rather than the form of the agreement.

As a practical matter it cannot be said that the licensors reserved any substantial right of "use".[23] They had granted the exclusive right to manufacture and sell and could obtain the patented articles only by purchase from the licensees. There is no evidence of any manufacture by either the licensors or any third persons either before or after the license agreement. There were no patented articles available to the licensors for their own use, as was the case in Broderick v. Neale, supra. Moreover, the agreement granted licensee the ex-

23. The Income Tax Regulations concerning § 117(q) of the 1939 Code provide: "(b) * * * The term 'all substantial rights to a patent' means all rights which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction. * * *

"Examples of rights which may or may not be substantial, depending upon the circumstances of the whole transaction in which rights to a patent are transferred, are: * * * (ii) the failure to convey to the transferee the right to use or to sell the patent property." § 39.117(q)–2.

clusive right to license others to make the rivets.

Particularly with the type of patented articles here involved, the right of use by the licensee may be implied from the exclusive right to manufacture and sell. This implied right is even inferred in the cases upon which defendant relies most strongly, i. e., Waterman v. Mackenzie, supra, and Broderick v. Neale, supra, with respect to articles made under the patent by the licensee.[24] Moreover, the only use of the rivets made or contemplated by the licensee was for demonstration purposes, and in this use the licensors may be held to have acquiesced. Under the holding in Bannister v. United States, supra, and Hickman v. Commissioner, supra, the omission of the word "use" in the granting clause is immaterial where use is not intended or is of "no practical significance."

A closer question arises with respect to the retention of the right to make and sell ferrous rivets to others than the aircraft industry. I think defendant is correct in its contention that the correspondence between Kinney and Flanders indicates that this restriction was not inadvertent. On the other hand, it may reasonably be inferred also from the correspondence that at the time of the execution of the license agreement, the parties were concerned primarily with an agreement which would result in production of the rivets, and that Cherry and Flanders were willing to grant whatever rights were necessary to accomplish that purpose. There is no evidence that when the original license agreement was executed, the licensors had any plan to make ferrous rivets themselves or arrange with third persons to do so; and

none in fact were so made. In 1944 the directors of Cherry Rivet Company made a market survey in fields other than aviation and found possible use for rivets in refrigerators, stoves and other products. Subsequent negotiations with Flanders and Cherry resulted in the amendment dated October 1, 1944 (Ex. 1–H), which, among other changes, granted to licensee the full right to manufacture and sell rivets of all materials for all purposes. In other words, when the actual production of rivets from ferrous material was first undertaken, it was done by the licensee and the license agreement was amended accordingly.

Moreover, it was held in United States v. Carruthers, supra, that a grant of all substantial rights to a patent for a particular industry constitutes a sale where the patents have "no established value" outside of that industry. At the time of the execution of the original license agreement, it was unknown whether the patented articles had any value outside the aircraft industry. At least it cannot be said that they had any "established value" for any other purposes and no attempt was made to use the patents except in the aircraft industry prior to the amendment of the license.

A consideration of all relevant factors supports the conclusion that all "substantial rights" were transferred to the licensee.

Pursuant to Rule 21 of the Rules of Practice of the United States District Court, Northern District of California, West's Ann.Code, plaintiff will prepare and present proposed findings of fact, conclusions of law, and form of judgment in accordance with this opinion.

24. In Waterman v. Mackenzie, the court said that "though this might carry by implication the right to use articles made under the patent by the licensee, it certainly does not authorize him to use such article made by others." 138 U.S. at page 256, 11 S.Ct. at page 335, 34 L.Ed. at 926. In Broderick v. Neale the court recognized that there was "an implied right in the partnership to use the machines manufactured by it." 201 F.2d at page 624.